IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-74,487





RONALD JEFFREY PRIBLE, JR., Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


OF CAUSE NO. 9211260 FROM THE 351ST DISTRICT COURT

HARRIS COUNTY




 

 COCHRAN, J., delivered the opinion of the Court in which Meyers,
Price, Womack, Johnson and Holcomb, JJ., joined. Keller, P.J., Keasler and
Hervey, JJ., concurred.


O P I N I O N



 In October 2002 appellant was convicted of capital murder for intentionally and
knowingly causing the deaths of Esteban Herrera and Nilda Tirado in the same criminal
transaction. (1) Pursuant to the jury's answers to the special issues set forth in Texas Code of
Criminal Procedure Article 37.071, Sections 2(b) and 2(e), the trial court sentenced appellant
to death. Direct appeal to this Court is automatic. (2) Appellant raises eight points of error. 
We will affirm.

FACTS

 In March and April, 1999, appellant committed a series of bank robberies in Houston,
Texas. He purportedly planned to use the proceeds of the robberies to go into business with
his friend, Esteban ("Steve") Herrera. Appellant's plan never came to fruition, however,
because Steve Herrera and his family were murdered in their home in Houston in the early
morning hours of April 24, 1999. Appellant was the last person seen with Steve at his house
prior to the murders. 

 Steve Herrera's brother, Edward, testified that he and Steve both sold drugs, and he
often supplied Steve with drugs. A week before the murders, Edward went to the house that
Steve shared with his girlfriend, Nilda Tirado, and their three children. Edward, Steve, and
appellant played pool and drank beer in Steve's garage that night. When Steve went inside
the house, appellant told Edward that he and Steve planned to open a bar together. Edward
testified that Steve never told him that he had any plans to go into business with appellant. 
 Edward saw appellant at Steve's house again on the evening of April 21. They played
pool in the garage, and Steve went inside the house at one point. While Steve was inside,
Edward saw appellant take a large amount of money out of his own wallet and count it. 
 

 On April 23, Steve paged Edward at 9:00 p.m. and 11:00 p.m. When Edward returned
his pages, Steve asked if Edward could get him some cocaine. Steve called Edward from
appellant's cell phone at 2:00 or 2:30 a.m. and said he was on his way home. Edward
received pages again at 3:00 and 4:00 a.m. He spent the night at a friend's house that night,
and he did not learn what happened to Steve and his family until the next morning. 

 Steve's brother-in-law, Victor Martinez, testified that he went to Steve's house in his
white Ford Escort shortly after 10:00 p.m. on April 23. When he arrived, the garage door
was raised and Steve and appellant were drinking beer and playing pool in the garage. 
Sometime around midnight, Nilda opened the door and called to Steve. He walked over to
her and they exchanged a few words and a kiss, then she went back inside and the men
continued playing pool. During the course of the evening, Victor Martinez heard Steve and
appellant talk about trying to get some cocaine from Edward. 

 They decided to go to a nightclub, Rick's Cabaret, at 12:30 a.m., so Steve lowered the
garage door, and the three men left in Martinez's car. They arrived at around 1:00 a.m. and
left sometime after 2:00 a.m. It took them about fifteen or twenty minutes to drive back to
Steve's house. On the way home, Steve used appellant's phone to page Edward. When they
returned, they talked in front of the house while Steve and appellant smoked marijuana, then
Steve and appellant went inside the garage, and Martinez drove home. Martinez testified that
when he left, the garage door was raised and Steve and appellant were playing pool. 
Martinez arrived home at about 3:30 a.m. and went directly to bed. He testified that he never
saw appellant enter Steve's house that evening.

 Gregory Francisco, who lived across the street from Steve Herrera, testified that he
saw Steve in his driveway with two of his children at 4:30 or 5:00 p.m. on April 23. At 9:00
or 9:30 p.m., he noticed that Steve's garage door was lowered to shoulder-level and that there
were people inside the garage listening to music. Some vehicles were parked in front of the
house, including a white car that looked like a Ford Escort. He went to bed at about 12:30
a.m. When he went outside at approximately 6:00 a.m. the next morning, Steve's garage
door was lowered and he saw smoke and heard loud music coming from the house. No one
answered the front door when Francisco and his wife rang the doorbell, so they tried to enter
the house through the side door to the garage. The door was hot, and there was smoke
coming out from under it. Francisco kicked the door open and saw Steve lying face-down
in a pool of blood inside the garage, so he told his wife to call 911. Firefighters arrived
shortly thereafter and found Nilda's badly burned body on a couch in the living room. The
fire was confined to the couch area and was merely smoldering at the time, but the house was
filled with smoke. Firefighters also discovered the bodies of Steve's seven-year-old
daughter, Valerie Herrera, and Nilda's seven-year-old daughter, Rachel Elizabeth Cumpian,
in one bedroom, and the body of Steve and Nilda's twenty-two-month-old daughter, Jade
Herrera, in the master bedroom. The children's bodies were covered in soot, and they
appeared to have died from smoke asphyxiation. 

 Investigator Marshall J. Kramer testified that flammable liquids were used to
deliberately set the fire in the living room. A burned red plastic gasoline container, an
aerosol can, and a roll of paper towels soaked in a flammable liquid were on the living room
floor, and a burned one-gallon metal can was on the couch next to Nilda's body. The metal
can contained Kutzit, an extremely flammable liquid that is normally used to dissolve tile
glue. Other cans of Kutzit were found in lockers inside the garage and in a storage shed
behind the house. Nilda was lying face-down on the couch, and there was blood around her
head. Her body was "charred from the exterior." Kutzit or gasoline had been poured on her
body and the couch. Police found a spent bullet under the carpet where the couch was
located. There were no signs of forced entry, and Steve had a wallet in his back pocket that
contained approximately $900.

 The medical examiner who performed the autopsies testified that the three children
died from inhaling toxic levels of soot and carbon monoxide. Steve's death was caused by
a penetrating gunshot wound to the back of his neck which severed the connection between
his brain and spinal cord. The stippling around the wound indicated that the gun was fired
within eighteen inches of his body. There was no exit wound and the bullet was recovered
from his body. Nilda died from a perforating gunshot wound to her neck that severed her
spinal cord. The bullet entered her neck on the back right side and exited the front left side. 
She suffered severe burns along the entire back side of her body that were consistent with a
flammable substance being poured on her body and set afire after she had been shot. Sperm
cells were found on oral, vaginal, and anal swabs taken during a forensic exam of her body. 
Steve's DNA was consistent with the DNA on the vaginal and anal swabs. Appellant's DNA
was consistent with the DNA on the oral swab. 

 Appellant gave two written statements to police. In his first written statement, he said
Steve picked him up at 8:00 or 9:00 p.m. on April 23, and they went over to Steve's house
to play pool and drink beer in the garage. Martinez joined them at about 11:00 p.m. They
later went to Rick's Cabaret in Martinez's car and stayed until 2:00 a.m. Martinez drove
them back to Steve's house, where they again played pool and drank beer, and Martinez left
twenty or thirty minutes later. At some point, Nilda opened the door leading into the garage
and gave Steve "a look," so appellant "knew it was time to leave." Steve drove him home
in his black Honda Prelude at 4:00 a.m., and he went straight to bed.

 Appellant later changed his story when a detective asked him what he would do if his
semen was found in or on Nilda's body. In his second written statement, he added that he
had been having an affair with Nilda. He said that he went inside the house at one point
during the evening while Steve remained in the garage. He and Nilda went into a bathroom,
and he bent her over the sink and began having sex with her. They stopped because they
mistakenly thought they heard Steve enter the house. Then Nilda began "sucking [his] dick
and jacking [him] off," and he did not remember "if [he] came or not." He went back into
the garage afterwards and told Steve to take him home. He claimed that he and Nilda had
only "messed around" and kissed on prior occasions, and that night was the first time they
had sex. He said he had never told anyone about their affair because it would ruin Nilda's
reputation.

 Police searched the home where appellant lived with his parents and found guns,
boxes of ammunition, and receipts for guns and ammunition. Police also found a
semiautomatic-pistol magazine that did not fit any of the weapons that were recovered. 
Firearms examiner Matthew Clements examined the spent bullet found in the living room
and the bullet recovered from Steve's body and concluded that they were fired from the same
weapon. Clements testified that the magazine recovered from appellant's home was identical
in design to a magazine for a nine-millimeter Ruger P85 pistol. (3) 

 In May 1999, shortly after the murders of Steve Herrera and Nilda Tirado, appellant
confessed to committing March and April bank robberies, and he was convicted in federal
court in September 1999. Michael Beckcom, a fellow inmate at the federal prison in
Beaumont, testified against appellant at trial. Beckcom testified that appellant told him that
he committed the murders. Appellant explained to Beckcom that he killed Steve because he
"took $250,000 of [his] hard-earned money." (4) He said that he and Steve argued about the
money in the "pool room," and that he thought Steve was going to kill him, so he shot him
in the back of the head. Nilda came into the garage during the argument and ran inside the
house to call the police. He shot Nilda in the back of the head and she fell face down onto
the couch. He looked for the money inside the house and could not find it. He stated that
he set the fire to cover his tracks, and that the children were in bed and died from smoke
inhalation. He bragged to Beckcom, "Anybody that can go into a house and take out a whole
family and get out without being seen is a bad mother fucker, and I'm that mother fucker."

 Beckcom testified that appellant told him that the police had DNA evidence, but Steve
and Nilda had an open relationship, and it was common knowledge that he and Nilda were
having an affair. He said police were looking for a .38 caliber pistol, but that gun was not
the murder weapon, and it was "clean" because he had sold it to "some girl." He also stated
that police found two drops on his shoe that looked like blood but were actually catsup. 

 Angela Serna Alvarez and Cynthia Garcia Flores, two of Nilda's closest friends,
testified that they had no knowledge of the alleged affair. Moreover, Ms. Alvarez testified
that Nilda once told her that she did not like appellant and that he gave her "the creeps." Ms.
Flores also testified that Nilda once told her that she was tired of appellant being at her house
and that he gave her "the creeps." Vincent Flores, Cynthia's husband, testified that he did
not believe that Steve and Nilda had an open relationship, and he said that Steve once got
angry at him for "putting a move" on Nilda.

 During the defense case-in-chief, appellant's mother, Sandra Prible, testified that she
met Beckcom while visiting appellant at the federal prison, after she had sent appellant a
copy of the probable-cause affidavit in his capital-murder case. J. Brent Liedtke, a former
attorney and fellow inmate at the federal prison, testified that he saw the copy of the probable
cause affidavit when he helped appellant with his case, and he saw appellant show it to other
inmates as well. Brian Maurice Fuller, a former federal prison inmate, testified that, in his
opinion, Beckcom was opportunistic and untruthful. Christine Bartolla, appellant's friend,
testified that she bought a .38 Special Taurus revolver from appellant in November 1998 and 
returned the gun to his father in November 2001. Appellant's former neighbor, Christina
Gurrusquieta, testified that she looked out her window on the night of the murder and saw
appellant and Steve talking in appellant's driveway sometime after 1:00 a.m., then Steve left
and appellant went inside the house.

SUFFICIENCY OF THE EVIDENCE

 In his sixth point of error, appellant argues that the evidence is legally insufficient to
support his conviction for capital murder. In evaluating the legal sufficiency of the evidence,
we must view the evidence in the light most favorable to the verdict and determine whether
any rational trier of fact could have found the essential elements of the offense beyond a
reasonable doubt. (5) 

 To convict appellant of capital murder, the jury had to find beyond a reasonable doubt
that appellant murdered Nilda Tirado and Steve Herrera by shooting each of them with a
firearm during the same criminal transaction. The State presented evidence that: 1) appellant
was the last person seen with Steve at the house prior to the murders; 2) he had a motive to
kill Steve; 3) the bullets that killed Nilda and Steve were fired from the same weapon; 4)
appellant's sperm was deposited in Nilda's mouth at some point prior to her death; 5) a fire
was set to destroy physical evidence, including evidence of appellant's DNA; and 6)
appellant admitted to Beckcom that he committed the murders. Appellant argues that
Beckcom's testimony was "questionable" because he testified in the hope of having his own
sentence reduced and he "could have learned the details of the alleged offense through the
probable cause affidavit in the appellant's possession." Beckcom, however, testified about
some details that were not contained in the probable cause affidavit. For example, he knew
that there was a pool table in the garage and appellant had drops of catsup on his shoe. 
Beckcom's testimony also contradicted or excluded some details that were contained in the
probable cause affidavit. He testified that appellant told him that Steve "took $250,000 of
[his] hard-earned money," but the amount recited in the probable cause affidavit was
$45,000. He knew that the police had DNA evidence and that appellant claimed to have had
an affair with Nilda, but he apparently did not know about appellant and Nilda's alleged
sexual encounter in the bathroom while Steve was in the garage. The jury was free to take
these discrepancies into account and to believe or disbelieve Beckcom's testimony based on
their evaluation of his credibility. 

 Appellant asserts that the scientific testimony was "equally questionable" because the
medical examiner could not conclusively determine the exact time at which appellant's
semen was deposited in Nilda's mouth. Appellant claimed that their sexual encounter was
consensual, but other evidence supported the State's theory that the encounter was non-consensual. Only Nilda's body was set on fire-presumably to cover up evidence of sexual
assault-and Nilda's friends testified that she disliked appellant. 

 Appellant further contends that is it "inconceivable" that he committed the offense
because "[t]here was no evidence of blood, soot, or any combustible materials either on [him]
or his clothing." The evidence showed that the murders took place in the early morning
hours of April 24, and the police did not arrive at appellant's house until approximately 5:00
p.m. that evening. The jury could have rationally concluded that appellant had ample time
to dispose of this type of physical evidence.

 Based on the evidence at trial, a rational jury could have concluded beyond a
reasonable doubt that appellant committed the murders of Nilda Tirado and Steve Herrera
during the same criminal transaction. (6) Point of error six is overruled. 

 In his seventh point of error, appellant contends that the evidence is factually
insufficient for the same reasons expressed in his sixth point of error. In a factual-sufficiency
review, we view all of the evidence in a neutral light, and we set the verdict aside only if the
evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the contrary
evidence is so strong that the standard of proof beyond a reasonable doubt could not have
been met. (7) A clearly wrong and unjust verdict occurs where the jury's finding is "manifestly
unjust," "shocks the conscience," or "clearly demonstrates bias." (8) 

 In this case, the same facts that make the evidence legally sufficient also make it
factually sufficient. The evidence supporting the verdict was not so weak as to be clearly
wrong and manifestly unjust, nor was the contrary evidence so strong that the standard of
proof beyond a reasonable doubt could not have been met. (9) Point of error seven is overruled.EVIDENCE OF THE CHILDREN'S DEATHS

Evidence of the Children's Deaths and Rule 404(b)

 In his first point of error, appellant argues that the trial court improperly admitted
evidence of extraneous offenses under Rule 404(b). Appellant was charged only with
causing the deaths of Steve Herrera and Nilda Tirado, but the trial court permitted the State
to introduce evidence that their three children also died from smoke inhalation caused by the
fire. 

 A trial court's ruling on the admissibility of extraneous offenses is reviewed under an
abuse of discretion standard. (10) As long as the trial court's ruling was within the "zone of
reasonable disagreement," there is no abuse of discretion, and the trial court's ruling will be
upheld. (11)

 While evidence of other crimes, wrongs, or acts is not admissible "to prove the
character of a person in order to show action in conformity therewith," it may be admissible
for other purposes, such as proof of motive, opportunity, intent, preparation, plan,
knowledge, identity, or absence of mistake or accident. (12) The list of exceptions under Rule
404(b) is "neither mutually exclusive nor collectively exhaustive." (13) This Court has held that
such extraneous-offense evidence is also admissible to corroborate certain kinds of
statements and testimony, such as to rehabilitate an impeached witness or corroborate a
defendant's confession. (14) In this case, the State used the evidence of the children's deaths
to support the testimony of a jailhouse informant, Michael Beckcom. This information
corroborated the defendant's confessions to Beckcom by detailing the manner in which the
crimes were committed with information that Beckham could not have obtained except from
appellant himself. 

 In addition to corroborating a defendant's confession, extraneous-offense evidence
may also be admissible as same-transaction contextual evidence, where "several crimes are
intermixed, or blended with one another, or connected so that they form an indivisible
criminal transaction." (15) In that situation, "the jury is entitled to know all relevant surrounding
facts and circumstances of the charged offense; an offense is not tried in a vacuum." (16) That
is precisely what occurred here.

 In this case, the trial court stated that the evidence was admissible as same-transaction
contextual evidence. This decision was within the zone of reasonable disagreement. Same-
transaction contextual evidence results when an extraneous matter is so intertwined with the
State's proof of the charged crime that avoiding reference to it would make the State's case
incomplete or difficult to understand. (17) 

 Although it is a delicate business, and there is the danger that evidence of the
"collateral consequences" of a defendant's actions may improperly divert the jury from the
charged offense or introduce significantly more prejudice than evidentiary value, it was not
an abuse of discretion in this case for the trial court to conclude that the murders of Steve and
Nilda and the deaths, by smoke inhalation, of their three children were so connected that they
formed an indivisible criminal transaction. 

 First, evidence of the children's deaths was part of the crime scene. That evidence
was necessary to fully understand the situation as neighbors and firefighters found it. From
the moment the Herrera's neighbor noticed their house was on fire, all of the people who
arrived at the scene were concerned about the survival and safety of all five family members
inside the home. The neighbor testified that although the smoke made it virtually impossible
to breathe, he tried to break into the home repeatedly because he thought he heard the baby
cry. Additionally, the firefighters who testified stated that they, too, made multiple trips into
the smoke-filled home in an attempt to find survivors. Testimony concerning the search for,
and discovery of, the children in the upstairs bedrooms was an integral part of the discovery
of the murder victims and description of the crime scene. Second, the children's deaths were
a direct consequence of appellant's conduct of setting fire to Nilda. According to appellant's
own statements to Michael Beckcom, he set Nilda's body on fire in the living room, knowing
that the children were asleep in the bedrooms of the house. And although the fire self-extinguished in the living room, it is a fair inference that appellant thought that the fire would
spread throughout the rest of the house, killing the children and destroying all of the crime-scene evidence contained inside it. Thus, Steve and Nilda's murders are so intertwined with
the deaths of their children that the State's case might well be incomplete without some
mention of the children's presence in the home. Under these circumstances, testimony about
the children's deaths fills in gaps of the interwoven events and consequences of a defendant's
criminal conduct and thus helps the jury to understand the case in context. In light of the
above, the trial court did not abuse its discretion in admitting the evidence of the children's
deaths despite appellant's Rule 404(b) objection. Point of error one is overruled.


Evidence of the Children's Deaths and Rule 403

 Appellant next argues that the trial court's admission of evidence that the children
died in the house fire violated Rule 403. In point of error two, appellant generally challenges
the admission of "the facts and circumstances surrounding the deaths of the complainants'
three children." In point of error four, he argues that the trial court erred in admitting "the
autopsy photographs depicting the dissection of each of the three bodies of the complainants'
children." In point of error five, he asserts that the trial court erroneously admitted "the
crime scene photographs of the three bodies of the complainants' children." 

 Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is
substantially outweighed by the danger of unfair prejudice, confusion of the
issues, or misleading the jury, or by considerations of undue delay, or needless
presentation of cumulative evidence.A proper Rule 403 analysis includes, but is not limited to, the following factors: (1) the
probative value of the evidence; (2) the potential to impress the jury in some irrational, yet
indelible, way; (3) the time needed to develop the evidence; and, (4) the proponent's need
for the evidence. (18) 

 This evidence had probative value to a contested matter-Beckcom's credibility. 
Beckcom, a key witness in the State's case against appellant, testified that appellant told
him that the children were in bed when he set the fire and that they died from smoke
inhalation. Evidence of these particular facts and circumstances corroborated Beckham's 
assertions and enhanced his credibility. Moreover, Beckcom's knowledge of these facts and
circumstances was also probative to show that it was, in fact, appellant who committed the
crime. (19) As for potential prejudice, appellant argues that the admission of this evidence
"carried with it the clear danger that the jury would be confused by the nature of the charge
against the appellant." However, there was little likelihood that the evidence would
encourage the jury to reach an irrational verdict or act on the basis of emotion. Although the
children's deaths were tragic, evidence of their deaths did nothing to prove that appellant was
responsible for the murders of Steve and Nilda. No matter how angry the jury might have
been about the children's deaths, that emotional response could be connected to appellant
only if the jury first found that he caused their parents' deaths. Therefore, the relatively
strong probative value of the evidence was not substantially outweighed by the mere
possibility of unfair prejudice. The trial court did not abuse its discretion in admitting this
evidence. Point of error two is overruled.

Evidence of the Children's Deaths and Due Process

 In point of error three, appellant raises a constitutional challenge to the admission of
the evidence that the children died from smoke inhalation caused by the fire. He argues that
the "admission of the extraneous offense deprived [him] of a fair and impartial trial, in
violation of his right to due process." For the same reasons expressed in the previous point
of error, we hold that the admission of this evidence did not deny appellant a fair and
impartial trial. The properly admitted same-transaction contextual evidence did not offend
appellant's due-process rights. Point of error three is overruled. 

Crime-Scene Photographs of the Children and Rule 403

 We next turn to appellant's complaints regarding the trial court's admission of
photographs. Appellant contends that even if the admission of the crime-scene and autopsy
photographs of the children were admissible under Rule 404(b), they were unfairly
prejudicial and thus violated Rule 403. The decision to admit or exclude photographic
evidence is generally left to the sound discretion of the trial court. (20) In deciding whether
photographs are unfairly prejudicial, we must also consider the following factors: the
number of photographs, the size, whether they are in color or black and white, whether they
are gruesome, whether any bodies are clothed or naked, and whether a body has been altered
by autopsy. (21) 

 Outside the presence of the jury, appellant objected to the crime scene photographs
depicting the children's bodies. In response, the trial court excluded five of the challenged
photographs. Seven photographs depicting the children's bodies and their locations were
admitted before the jury. (22) Five of these photographs depict the bodies of Rachel and Valerie
as they were found in their bedroom, and two of the photographs depict Jade's body as she
was found in the master bedroom. (23) 

 Specifically, State's Exhibit 47 shows Rachel lying face-down on the bedroom floor. 
In State's Exhibit 49, Rachel is lying face-up on the floor, after being rolled over by the
paramedics. State's Exhibit 50 shows Valerie's bed, with her body lying face-down at the
top of the bed and parallel to the headboard. State's Exhibit 52 more clearly depicts
Valerie's body lying face-down on the bed. In State's Exhibit 55, Valerie is lying face-up
on the bed, after being rolled over by the paramedics. The other two photographs depict
Jade's body as it was found in the master bedroom. State's Exhibit 63 shows Jade lying face-up on the floor next to the bed, and State's Exhibit 65 offers a closer view of her body. 

 In all of the photographs, the children are wearing their bedclothes, and their bodies
are covered in soot. The photographs of the children lying face-up show the soot and mucus
that accumulated in and around their mouths and noses. Although deceased, the children
were not mutilated or charred. With the exception of the discoloration around their noses and
mouths, they look like they are sleeping. The danger of unfair prejudice from the admission
of these photos is small, particularly because the jury also viewed extremely grisly
photographs of Nilda's badly burned body.

 These photographs accompanied the testimony of Marshall J. Kramer, who
investigated the crime scene. Kramer testified that the children's bodies were found in the
bedrooms and that the accumulation of soot and mucus in their mouths and noses was
indicative of smoke asphyxiation. Here, Rule 403 did not prohibit witnesses from testifying
that the children died from smoke inhalation as a result of the fire. The crime scene
photographs depicting the location and condition of the children's bodies were limited in
number, and the State focused on them only to the extent necessary to explain the neighbor's
and firefighters' attempts to account for all of the inhabitants of the house and to corroborate
Beckcom's testimony. Therefore, the probative value of the crime-scene photographs was
not substantially outweighed by the danger of unfair prejudice, and the trial court did not
abuse its discretion in admitting these photographs over appellant's Rule 403 objection. (24) 
Point of error five is overruled.

Autopsy Photographs of the Children and Rule 403

 We now turn to whether the admission of the children's autopsy photographs violated
Rule 403. In a hearing outside the presence of the jury, appellant objected to the autopsy
photographs depicting the "dissected body parts" of the children. Defense counsel argued
that the photographs were unnecessary and unfairly prejudicial, and offered to stipulate to
the cause of death. The trial court admitted the photographs over defense counsel's
objection. 

 The record contains twelve color photographs taken during the children's autopsies.
All of the photographs are detailed close-ups, and the medical examiner used instruments to
hold the organs open in some of them. 

 Specifically, State's Exhibits 144 through 146 are photographs taken during the
autopsy of Rachel. State's Exhibit 144 is a picture of her "neck organs," showing a thick
layer of soot on her tongue and into the opening of her larynx. State's Exhibit 145 offers a
closer view of the carbon material going down into her larynx. State's Exhibit 146 is a
picture of her lungs, which have been dissected to show the amount of carbon material
contained within them. 

 State's Exhibits 159 through 162 are photographs taken during the autopsy of Valerie. 
State's Exhibit 159 depicts her "neck organs," with a thick layer of carbon material from the
tip of the tongue to the trachea. State's Exhibit 160 is a closer view of the larynx. State's
Exhibit 161 depicts her dissected lungs and the amount of carbon material contained within
them. State's Exhibit 162 is a picture of her esophagus, showing the amount of carbon
material that entered her stomach. 

 State's Exhibits 167 through 171 are photographs taken during the autopsy of Jade. 
State's Exhibit 167 shows her dissected lungs and the amount of carbon material contained
within them. State's Exhibit 168 is a closer view of one of her lungs. State's Exhibit 169
depicts the amount of carbon material on her dissected tongue, and State's Exhibit 170
depicts the amount of carbon material in her larynx. State's Exhibit 171 is a picture of her
stomach, showing the amount of carbon material inside it.

 The State did not need the autopsy photographs of the children's dissected internal
organs to fully explain the crime scene or to corroborate Beckcom's testimony. Sufficient
corroboration was provided by witness testimony, autopsy reports, crime scene photographs,
and other autopsy photographs of the children's bodies before their internal organs had been
removed. Furthermore, the cause of the children's death was not disputed. Most important,
appellant was not charged with murdering them. (25) Thus, the minimal probative value of the
autopsy photographs at issue, if any, was substantially outweighed by the danger of unfair
prejudice, confusion of the issues-by unduly focusing the jury's attention upon the deaths of
the children rather than the deaths of their parents for which appellant was charged- and
needless presentation of cumulative evidence. The trial court abused its discretion in
admitting the photographs over appellant's Rule 403 objection. (26) 

 Finding error in the admission of evidence, however, does not end our analysis. We
must next determine whether the error was harmless under Rule 44.2(b). Although it is a
close call, we cannot conclude that the State's use of these autopsy photographs affected
appellant's substantial rights. Appellant argues in his brief that the State emphasized the
children's deaths to the jury and argued his bad character because he could "take out a whole
family and come out clean." While appellant is correct and such argument is improper, we
cannot see how the State's argument would have been affected had the autopsy photographs
been excluded. Even the slightest reference to the crime scene and the children's deaths
could still support that argument. And there are additional reasons for our conclusion. First,
at the time of their admission, the jury had already seen and heard about the disturbing
circumstances of the children's deaths through properly admitted photographs and testimony. 
Second, these photographs were not particularly gruesome or emotionally charged; they 
were clinical and depicted disembodied organs and tissue. Third, they pale in comparison
to the properly admitted post-mortem photographs of Steve Herrera and Nilda Tirado whose
deaths appellant was charged with intentionally causing. Fourth, the State, while
emphasizing appellant's admission to Beckcom that he had "taken out" an entire family, did
not dwell upon or emphasize the improperly admitted post-autopsy photographs of the
children. Fifth, these photographs have nothing to do with the disputed issue at trial of
whether appellant murdered the children's parents as charged. Thus, these photographs do
not affect the determination of appellant's guilt in this case and would not emotionally sway
a factfinder until and unless he had found that appellant was the person who had caused the
parents' deaths. (27) In sum, we conclude that the erroneous admission of the autopsy
photographs depicting the children's internal organs did not affect appellant's substantial
rights. (28) Point of error four is overruled.

PUNISHMENT PHASE

 In point of error eight, appellant asserts that the trial court improperly instructed the
jury that they could not consider sympathy when answering the special issues. Appellant
argues that this anti-sympathy charge restricted the effect of the mitigation evidence and
violated his Eighth Amendment right against cruel and unusual punishment.

 We have previously held that anti-sympathy charges do not unconstitutionally
contradict mitigation instructions. (29) We have further held that anti-sympathy charges are
appropriate in that they properly focus the jury's attention on those factors relating to the
moral culpability of the defendant. (30) Finding no error in this punishment change, we overrule
appellant's eighth point of error. 

 We affirm the judgment of the trial court.



Cochran, J.


Delivered: January 26, 2005


Publish

1. Tex. Penal Code § 19.03(a). 
2. Tex. Code Crim. Proc. art. 37.071, § 2(h).
3. Although it is clear from the evidence presented at trial that Steve and Nilda were both
killed with the same weapon, it is unclear what exact type of gun was used. The recovered
bullets were consistent with several types of firearms, including a Ruger P85 and a .38 caliber
pistol. The murder weapon was never recovered. 
4. The evidence presented at trial showed that the amount of money that appellant
obtained in the bank robberies was far less than $250,000. Detective Shane McCoy testified that
appellant took $9,690 in the first robbery, $12,914 in the second robbery, $9,571 in the third
robbery, $3,979 in the fourth robbery, $3,175 in the fifth robbery, and $6,660 in the sixth
robbery, for a total of $45,929.
5. See Jackson v. Virginia, 443 U.S. 307, 319 (1979).
6. Jackson, 443 U.S. at 319.
7. Zuniga v. State, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).
8. Santellan v. State, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997). 
9. Zuniga, 144 S.W.3d at 481.
10. Santellan, 939 S.W.2d at 169.
11. Id.
12. Tex. R. Evid. 404(b).
13. Montgomery v. State, 810 S.W.2d 372, 388 (Tex. Crim. App. 1990).
14. Long v. State, 823 S.W.2d 259, 273 (Tex. Crim. App. 1995); Crank v. State, 761
S.W.2d 328, 343 (Tex. Crim. App. 1988).
15. Rogers v. State, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993). 
16. Moreno v. State, 721 S.W.2d 295, 301 (Tex. Crim. App. 1986).
17. Rogers, 853 S.W.2d at 33.
18. Montgomery, 810 S.W.2d at 389-90.
19. Appellant argues that Beckcom could have learned of the children's deaths from
smoke inhalation by reading the probable cause affidavit, but there is no evidence in the record
that Beckcom actually saw the affidavit.
20. Erazo v. State, 144 S.W.3d 487 (Tex. Crim. App. 2004); Williams v. State, 958 S.W.2d
186 (Tex. Crim. App. 1997). In Erazo, this Court clarified the requirements for the admission of
photographs. Recognizing the potential vagueness of past case law, we noted:

We often have said that photographs depicting matters described by admissible
testimony are generally admissible. This statement when viewed in isolation is far
too broad and provides no guidance to the bench and the bar to determine which
photographs may be admitted and which must be excluded.

144 S.W.3d at 489. In attempting to provide a more useful guideline for the admission of
photographs, we concluded that:

If there are elements of a photograph that are genuinely helpful to the jury in
making its decision, the photograph is inadmissible only if the emotional and
prejudicial aspects substantially outweigh the helpful aspects.

Id. at 491-492. 
21. Narvaiz v. State, 840 S.W.2d 415, 429 (Tex. Crim. App. 1992).
22. The record contains the original crime scene photographs, which were neither close-up
nor particularly detailed. Rule 34.6(g)(2) of the Texas Rules of Appellate Procedure provides for
the appellate court's use of original exhibits:


If the trial court determines that original exhibits should be inspected by the
appellate court or sent to that court in lieu of copies, the trial court must make an
order for the safekeeping, transportation, and return of those exhibits. The order
must list the exhibits and briefly describe them. To the extent practicable, all the
exhibits must be arranged in their listed order and bound firmly together before
being sent to the appellate clerk. On any party's motion or its own initiative, the
appellate court may direct the trial court clerk to send it any original exhibit.


TEX. R. APP. P. 34.6(g)(2). 
23. In his brief, appellant also mentions State's Exhibits 56, 57, 60, 61, 62, 64, 66, and 67. 
State's Exhibits 56, 57, and 67 depict the areas where the children were found, after their bodies
had been removed. State's Exhibits 60 and 61 are photographs of the master bedroom where
Jade is not visible. State's Exhibit 62 is a photograph of a ceiling vent. State's Exhibits 64 and
66 were not admitted. Appellant also mentions State's Exhibit 68, which is a crime scene
videotape, not a photograph. Appellant's argument in his brief encompasses only the admission
of the crime scene photographs depicting the children's bodies; thus, we decline to address the
admission of these other exhibits. 
24. Compare Sonnier v. State, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995)(crime scene
photographs and a videotape were admissible to show the reality of a brutal double murder) with
Erazo, 144 S.W.3d at 488 (admission of photograph of fetus removed from murder victim's
womb during autopsy violated Rule 403).

 In Erazo, this Court distinguished between the admissibility of crime-scene photographs,
which depict the direct and immediate results of a defendant's actions, and other photographs,
such as those taken after an autopsy, which do not depict what the defendant actually did, but
rather the collateral results of the crime or steps in the investigatory process far removed from the
crime scene as the defendant left it. We stated that:

A crime-scene photograph or an autopsy photograph is not admissible simply to
show the death of the individual. These photographs are admissible despite the
fact, and because, they show more than the testimony. But that "something more"
must be relevant and helpful to the jury.

Id. at 493. 
25. The cases that the State relies upon as holding that autopsy photographs are generally
admissible as relevant in helping the medical examiner explain the cause of death, deal with
autopsy photographs of the victim whose death the defendant was charged with causing. See
Rayford v. State, 125 S.W.3d 521, 530 (Tex. Crim. App. 2003) (admitting autopsy photos of
capital murder child victim because one disputed issue was whether victim had been kidnapped
and dragged into culvert while alive; photos showed pre-death injuries consistent with
kidnapping theory); Salazar v. State, 38 S.W.3d 141, 151 (Tex. Crim. App. 2001) (autopsy
photographs of capital murder victim showed child's extensive internal injuries which could not
have been caused in the manner defendant had explained them); Rojas v. State, 986 S.W.2d 241,
249 (Tex. Crim. App. 1998) (autopsy photos of capital murder victim showing injuries to her
pelvic area, although not the cause of her death, were "probative of appellant's mental state at the
time of the murder, the specific circumstances of the murder, and the fact that appellant omitted
some information from his statements to the police"). In each of those cases, the photographs
were probative of some disputed fact concerning the murder victim's death. Here, the children
were not the victims of the charged murder, and no one disputed that they died of smoke
inhalation which was the ostensible purpose for which they were admitted.
26. See Erazo, 144 S.W.3d at 496. 
27. Appellant does not claim that the autopsy photographs affected the jury's deliberations
during the punishment phase, and thus, we will not address that question.
28. Tex. R. App. P. 44.2(b).
29. Tong v. State, 25 S.W.3d 707, 711 (Tex. Crim. App. 2000); Fuentes v. State, 991
S.W.2d 267, 276 (Tex. Crim. App. 1999).
30. Tong, 25 S.W.3d at 711; McFarland v. State, 928 S.W.2d 482, 522 (Tex. Crim. App.
1996).