**Opinion filed July 16, 2009**



In The

# Eleventh Court of Appeals

———————

## No. 11-07-00249-CR

———————

### JUAN MANUEL ALBARADO, Appellant

### V.

### STATE OF TEXAS, Appellee

**On Appeal from the 104th District Court**

**Taylor County, Texas**

**Trial Court Cause No. 15959B**

## M E M O R A N D U M   O P I N I O N

The jury found that sixteen-year-old Juan Manuel Albarado murdered twenty-four-year-old Joe Louis Carrion and assessed punishment at confinement for thirty years. We affirm.[1]

Two different groups of people were a part of the backdrop that led up to this homicide.

On the night before the murder, Albarado was smoking marihuana at Roxanne Zepeda's house. Later, he joined a group of people who had gathered at Melissa Castillo's house. The people were drinking and doing illegal drugs. Around 9:00 p.m. that evening, Albarado and Michael

---

[1]On December 19, 2005, the Juvenile Court of Taylor County granted the "State's Petition for Waiver of Jurisdiction and Discretionary Transfer from Juvenile Court to a Criminal Court." This case was then tried in the 104th District Court of Taylor County.

Santana made the decision to borrow a gun from a friend. Albarado testified that he and some of his friends had been the targets of a drive-by shooting earlier in the year; they wanted the gun for protection. They also had received threats. However, these friends and the prior event were not connected to the present offense. Albarado and Santana left, picked up a pistol-gripped shotgun, and returned to the others at Castillo's house. They loaded the gun with 00 buckshot and smoked some more marihuana. Castillo did not want the shotgun in the house, and she asked that it be taken outside. Albarado took the loaded shotgun outside and laid it on a rock. He continued to drink and use drugs.

Later, sometime after midnight, some people drove by Castillo's house. Someone in the car was yelling for John Lopez, wanting him to come out and fight. In response, some of Albarado's group yelled back and also threw beer bottles at the car. The driver quickly drove away but returned and drove the vehicle around the block a number of times, eventually leaving the area.

Ultimately, the victim and others went to Castillo's house, and a fight started between the two groups. The victim and Albarado, as well as others, were involved in the fight and were on opposite sides of the conflict. During the fight, Santana got the loaded shotgun from the rock and handed it to Albarado. Albarado fired the shotgun in the air, and people began to "scatter." He fired some shots into the grille on a vehicle that had been driven there. He continued to fire the shotgun in the direction of the people with whom his friends had been fighting but who were now fleeing. The victim was one of the ones who was fleeing as Albarado kept going toward the group, leaving a trail of empty shell casings as he went. The victim did not get away. Albarado shot him in the back. Forensic evidence showed that there were six different shotgun pellet wound sites on the victim's body. One of those six pellets penetrated his heart, and the victim later died from it.

Albarado challenges his conviction in six points. In his first point, he basically alleges that the trial court erred when it instructed the jury regarding the mens rea applicable to these facts and this particular charge of murder. The grand jury returned a two-paragraph murder indictment against Albarado in which it charged, in the first paragraph, under TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2003), that he intentionally and knowingly caused the victim's death by shooting him in the back and head with a deadly weapon. In the second paragraph, the grand jury, under TEX. PENAL CODE ANN. § 19.02(b)(2) (Vernon 2003), charged that Albarado "did then and there intentionally and knowingly, with intent to cause serious bodily injury . . . , commit an act clearly dangerous to

2

human life, . . . thereby causing" the victim's death. The jury found Albarado guilty of the offense charged in Paragraph Two.

Section 19.02(b)(1) and (2) provides that a person commits an offense if he:

> (1) intentionally or knowingly causes the death of an individual;
>
> (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.

In connection with the charge in Paragraph Two of the indictment, the trial court charged the jury:

*PARAGRAPH 2 OF THE INDICTMENT*

> A person commits the offense of Murder if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.
>
> With regard to *PARAGRAPH 2* of the indictment, "intent to cause serious bodily injury," a person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective to cause the result.
>
> With regard to *PARAGRAPH 2* of the indictment, "committing an act clearly dangerous to human life," a person acts intentionally, or with intent, when it is his conscious objective to engage in the conduct.
>
> Now, if you find from the evidence beyond a reasonable doubt that on or about May 14, 2005, in Taylor County, Texas, the defendant, JUAN MANUEL ALBARADO, did then and there, with intent to cause serious bodily injury to an individual, namely Joe Louis Carrion, commit an act clearly dangerous to human life, to wit: shooting the said Joe Louis Carrion in the back or head with a firearm, thereby causing the death of the said Joe Louis Carrion, then you will find the defendant, JUAN MANUEL ALBARADO, guilty of the offense of Murder as alleged in Paragraph Two of the indictment.

In order to prove murder under Section 19.02(b)(2) as charged in Paragraph Two in this case, the State had to prove that Albarado intended to cause serious bodily injury to the victim, that he committed an act objectively clearly dangerous to human life, and that the act caused the victim's death. *Lugo-Lugo v. State*, 650 S.W.2d 72, 81 (Tex. Crim. App. 1983).[2] The language "commits an act clearly dangerous to human life," as used in Section 19.02(b)(2), does not require proof of a

---

[2]The offense in *Lugo-Lugo* is the same as involved in this case, but the offense now appears in Section 19.02(b)(2) rather than in former TEX. PENAL CODE § 19.02(a)(2) (1973).

3

culpable mental state. The focus is on "the mental state of the individual on the particular result and not on the conduct that causes death." *Lugo-Lugo*, 650 S.W.2d at 81-82.

Murder is a "result of conduct" type of offense. The culpable mental state relates to the result of the conduct, not the conduct itself. *Roberts v. State*, 273 S.W.3d 322, 328-29 (Tex. Crim. App. 2008); *Lugo-Lugo*, 650 S.W.2d at 82; *see also Lomax v. State*, 233 S.W.3d 302, 307 n.16 (Tex. Crim. App. 2007).

In *Fuller v. State*, 819 S.W.2d 254, 256 (Tex. App.—Austin 1991, pet. ref'd), the court held that it was error to include "'engage in conduct' language in the definitional portion of a jury charge" when the offense is a result-of-conduct offense. Likewise, in *Wallace v. State*, 763 S.W.2d 628, 629 (Tex. App.—San Antonio 1989, no pet.), the court held that a jury charge in which the trial court defines "'intentionally' and 'knowingly' as they relate to the nature of the conduct as well as the result of the conduct is error." Our Court of Criminal Appeals has quoted those statements with approval. *Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994).

The trial court here, by its definitions, generally charged the jury on intent in relation to the commission of the act clearly dangerous to human life. The State argues that the inclusion of the definition of "intentionally" as it relates to conduct did nothing but increase its burden. However, that argument has been expressly disapproved as an attempt to change the offense of murder under Section 19.02(b)(2) from a result-oriented offense to both a result and a conduct offense. *Lugo-Lugo*, 650 S.W.2d at 81-82.

Because this case involves a result-oriented offense, murder as defined in Section 19.02(b)(2), and because it is error to include a definition of "intentionally" as it relates to conduct in a result-oriented offense, the jury charge contained error. However, an erroneous jury charge does not result in automatic reversal. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). We now perform a harm analysis.

There is a two-step review in analyzing jury charge error. First, we determine whether error actually occurred. Next, we must determine whether sufficient harm resulted as a result of the error. *See* TEX. CODE CRIM. PROC. ANN. art. 36.19 (Vernon 2006); *Abdnor*, 871 S.W.2d at 731-32. Where a timely objection has been made at trial, as was done here, all that an appellant must show is that there was some harm. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). The harm must be actual rather than theoretical. *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986). In *Almanza*, the court stated that we must assess the harm "in light of the entire jury charge, the state

4

of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171.

In reviewing for harm resulting from the inclusion of improper conduct elements in the definitions portion of the jury charge, we may consider the extent to which the application paragraphs of the charge limit culpable mental states. *Cook*, 884 S.W.2d at 492 n.6.

In the case now before us, the trial court properly limited the culpable mental state to the results of Albarado's conduct. Furthermore, the evidence showed that Albarado had a loaded, pistol-gripped shotgun and that, although he fired the first shot in the air, he kept moving toward the opposition and continually fired a deadly weapon in their direction as they were running away.

The evidence also shows that on May 29, 2005, Albarado escaped from the Taylor County Juvenile Justice Center where he was being held after law enforcement officers arrested him for this offense. He was later found in San Diego, California, and returned to custody on June 24, 2005. Although Albarado testified that he did not intend for anyone to die, he did admit that he was the shooter. Also, he was positively identified as the one who was moving toward the fleeing crowd while shooting the shotgun in their direction. Finally, it was one of the 00 buckshot pellets that caused the victim's death.

Reviewing the record as a whole, we determine that there was no harm caused by the error in the definitions portion of the trial court's charge. Albarado's first point of error is overruled.

In his second point, Albarado complains that the trial court committed error when it rejected his requested issue on self-defense.

Former TEX. PENAL CODE § 9.31 (1995) was in effect at the time of this offense and at the time of trial. (See now TEX. PENAL CODE ANN. § 9.31 (Vernon 2008)). That section dealt with the issue of self-defense. Under the former version of Section 9.31, a person was entitled to an instruction regarding self-defense if there was some evidence that he intended to use force against another person, that he did use force, and that he used force only because he reasonably believed that the use of such force was immediately necessary to prevent the use or attempted use of unlawful force against him. TEX. PENAL CODE ANN. § 9.32 (Vernon Supp. 2008) addresses the issue of deadly force. The use of *deadly* force is justified if the use of force would be justified under Section 9.31 and when and to the degree that the one exercising deadly force had a reasonable belief

that the deadly force was immediately necessary to protect him against the other's use or attempted use of deadly force.

Under the former version, TEX. PENAL CODE § 9.32(a)(2) (1995), a person was justified in using deadly force against another if a reasonable person in his situation would not have retreated. In other words, if it would have been reasonable to retreat, the use of deadly force was not justified under the former version of Section 9.32(a)(2). (The matter of retreat is now covered in Sections 9.31 and 9.32(c) and (d)).

One who claims self-defense has the burden of producing some evidence to support that claim. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). If the issue of self-defense is not raised by the evidence, the trial court is not required to instruct on it. *Ex parte Nailor*, 149 S.W.3d 125, 132 (Tex. Crim. App. 2004). In order to determine whether one is entitled to an instruction on the issue, we view the evidence in the light most favorable to the defendant. *Id*.

There was testimony that someone in the group fighting Albarado and his friends said, "Go get the gun." There is no evidence that anyone ever saw another gun. The evidence shows that, after Albarado fired a shot into the air, the victim and the others with him were running away from Albarado. Nevertheless, Albarado continued to fire the shotgun as he moved toward the fleeing group. At the time that Albarado shot the victim in the back, a person would not have believed, reasonably, that deadly force was immediately necessary to protect himself against the use or attempted use of deadly force. Furthermore, in this situation, applying former Section 9.32(a)(2), we cannot say that a reasonable person would not have retreated.

When viewed in the light most favorable to Albarado, the most that can be said is that he attacked elements of the offense that the State was required to prove, rather than offering a legal justification. He neither argued nor presented evidence that he committed the offense but that he was justified in committing it; he simply said that he did not intend for anyone to die. *See Ex parte Nailor*, 149 S.W.3d at 132-34; *Young v. State*, 991 S.W.2d 835, 839 (Tex. Crim. App. 1999). Albarado was not entitled to an instruction on the law of self-defense, and the trial court did not err in refusing the instruction. Albarado's second point is overruled.

In Albarado's third point of error, he claims that his lawyer afforded him ineffective assistance of counsel when counsel did not request a jury charge on the issue of sudden passion. If a defendant is convicted of murder, he may argue that he caused the death while under the immediate influence of sudden passion arising from an adequate cause, as Albarado did in this case. TEX.

6

PENAL CODE ANN. § 19.02(d) (Vernon 2003). If the defendant establishes sudden passion and adequate cause by a preponderance of the evidence, the offense level is reduced from first degree to second degree, and the ensuing punishment range is reduced. *Id*.

To prevail on a claim of ineffective assistance of counsel, an appellant must establish that his lawyer's performance fell below an objective standard of reasonableness and that there is a "reasonable probability" the result of the proceeding would have been different but for counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 693-94 (1984); *Mallett v. State*, 65 S.W.3d 59, 62-63 (Tex. Crim. App. 2001). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Hernandez v. State*, 726 S.W.2d 53, 55 (Tex. Crim. App. 1986). The purpose of this two-pronged test is to judge whether counsel's conduct so compromised the proper functioning of the adversarial process that the trial cannot be said to have produced a reliable result. *Thompson v. State*, 9 S.W.3d 808, 812-13 (Tex. Crim. App. 1999).

The review of defense counsel's representation is highly deferential and presumes that counsel's actions fell within a wide range of reasonable professional assistance. *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). Appellant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Jackson v. State*, 877 S.W.2d 768 (Tex. Crim. App. 1994); *Hayden v. State*, 155 S.W.3d 640, 648 (Tex. App.—Eastland 2005, pet. ref'd). When the record is silent on the motivations underlying counsel's tactical decisions, an appellant usually cannot overcome the strong presumption that counsel's conduct was reasonable. *Thompson*, 9 S.W.3d at 813. In order to defeat *Strickland*'s presumption of reasonable professional assistance, "any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Id.* at 814 (quoting *McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996)). We do not inquire into trial strategy unless no plausible basis exists for trial counsel's actions. *Johnson v. State,* 614 S.W.2d 148, 152 (Tex. Crim. App. 1981). When the record contains no evidence of the reasoning behind trial counsel's actions, we cannot conclude that counsel's performance was deficient. *Jackson*, 877 S.W.2d at 771.

If Albarado was not entitled to a punishment phase instruction on sudden passion, then trial counsel was not ineffective in not requesting it.

As with the matter of self-defense discussed above, under the controlling standard of review, we must view the evidence in the light most favorable to Albarado to determine whether there is

some evidence that an adequate provocation existed for his conduct, that is, that a passion or an emotion such as fear, terror, anger, rage, or resentment existed; that the homicide occurred while the passion still existed and before there was reasonable opportunity for the passion to cool; and that there was a causal connection between the provocation, the passion, and the homicide. *See* TEX. PENAL CODE ANN. § 19.02(a)(1), (a)(2), (d) (Vernon 2003); *McKinney*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005). A charge on sudden passion arising from fear is not required unless the actor's fear reaches that point where he would be incapable of rational and collected thought. *Kennedy v. State*, 193 S.W.3d 645, 654 (Tex. App.—Fort Worth 2006, pet. ref'd). Ordinary anger or causes of a defendant's own making are not legally adequate causes. *Naasz v. State*, 974 S.W.2d 418, 423 (Tex. App.—Dallas 1998, pet. ref'd).

Even when we view this record in the light most favorable to Albarado, as we are required to do, there is no evidence to raise the issue of sudden passion. Albarado chose to enter a fight with the victim's group. Further, it appears that he had the presence of mind to fire the shotgun into the air, as he says, to frighten the members of the opposing group away. It also appears that he methodically advanced toward the other group, firing his shotgun. This record does not raise the issue that anyone acted in a manner that would produce an emotion sufficient to render the mind of a person of ordinary temper incapable of cool reflection. *See* Section 19.02(a)(1), (a)(2), (d); *McKinney*, 179 S.W.3d at 569; *Kennedy*, 193 S.W.3d at 653-54. Because the issue of sudden passion was not raised, Albarado was not entitled to have an instruction regarding it presented to the jury; his trial counsel was not ineffective for failing to ask for the instruction. We overrule the third point.

In his fourth point, Albarado claims that the State withheld evidence from him in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Before one may succeed in showing a *Brady* violation, the accused must show that (1) the evidence is favorable to the accused because it is exculpatory or impeaching, (2) the State suppressed evidence either inadvertently or willfully, and (3) the suppression of the evidence resulted in prejudice (i.e., that it was material). Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is one that is sufficient to undermine confidence in the outcome of the case. *Ex parte Reed*, 271 S.W.3d 698, 726-27 (Tex. Crim. App. 2008).

The evidence that Albarado claims was withheld from him comes from two sources. First, Zepeda made a phone call while she was in custody. In that conversation, Zepeda made the statement that someone in the rival group had yelled for "someone to get their gun." The State admits that Zepeda said, in that phone conversation, that "Scoony's [from the rival group] group shot at us." The State argues, however, that Albarado knew about the phone call and about its contents. The State had supplied the first information to them in writing in response to a motion filed by Albarado. It is apparent from questioning by Albarado's trial counsel that he knew about the contents of this conversation at Albarado's earlier juvenile certification hearing. There can be no *Brady* violation when the information claimed to be withheld by the State is known to the defendant. *State v. DeLeon*, 971 S.W.2d 701, 706 (Tex. App.—Amarillo 1998, pet. ref'd).

Albarado also alleges that the State withheld evidence regarding gang activity collected under TEX. CODE CRIM. PROC. ANN. ch. 61 (Vernon 2006 & Supp. 2008). That chapter provides a procedure whereby criminal justice agencies may gather information and place it into a database for the purpose of handling street gang activity. This procedure is not mandatory, and the Abilene Police Department did not keep such records. The State's unchallenged position, then, is that the evidence requested by Albarado did not exist. The State is not required to disclose information that it does not have and that is not known to exist. *Harm v. State*, 183 S.W.3d 403, 407 (Tex. Crim. App. 2006).

Furthermore, Albarado had the burden to show that, in light of all of the evidence, it was reasonably probable that the outcome of the case would have been different had the State disclosed the information. *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002). In this regard, Albarado simply states conclusions that there would have been "a different defense strategy" that "would necessarily have resulted in an acquittal." The first conclusion is made only in relation to "prior drive by shootings" and "the demise of a potential witness." Albarado has not complained that there was any evidence in existence that was withheld in connection with those two items.

Albarado has not met his burden to show that *Brady* materials were withheld. He had the information. Even if he had shown that *Brady* materials had been withheld, he has not shown how

9

the outcome of this case would have been different if the State had disclosed the materials. His fourth point is overruled.[3]

Albarado maintains in his fifth point that the trial court erred when it admitted evidence that he had escaped while in custody for this offense. We disagree. With few exceptions, none of which are applicable here, an inference of guilt may be drawn from evidence of escape, and such evidence is admissible for that purpose. *Foster v. State*, 779 S.W.2d 845, 859 (Tex. Crim. App. 1989).

Although not mentioned in his stated point of error, Albarado also makes the argument that the trial court erred when it admitted evidence of gang affiliation. He claims that it was "improper character evidence." The State points out that Albarado did not object to this evidence when offered and that he has waived any complaint about the admission of the evidence. We agree. In order to preserve an error in the admission of evidence for appellate review, a defendant must make a timely objection. *See* TEX. R. APP. P. 33.1(a)(1); *Tell v. State*, 908 S.W.2d 535, 544 (Tex. App.—Fort Worth 1995, no pet.). Albarado has waived the complaint. Albarado's fifth point is overruled.

Albarado asserts in his sixth point "that there was insufficient evidence to sustain a conviction for murder under [Section] 19.02(b)(2) as charged to the jury." Albarado discusses diverse matters under this point.

First, he complains again about the punishment phase testimony related to gang activity and gang tattoos offered through Deputy Sheriff Brad Birchum. Deputy Birchum is in the narcotics division at the sheriff's office, and he also works with the FBI on a Safe Streets Gang Task Force in Abilene. Albarado did not object to this testimony, and he has waived any complaint in connection with its admission into evidence. *See* Rule 33.1(a)(1). Albarado also testified about his tattoo. Furthermore, evidence of gang tattoos is admissible. At the punishment phase of a criminal trial, evidence may be presented as to any matter that the court deems relevant to sentencing, including evidence of the defendant's background or character. TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (Vernon Supp. 2008); TEX. R. EVID. 401. A defendant's choice of tattoos can reflect his character. Likewise, his choice of tattoos can demonstrate a motive for his crime. *Conner v. State*, 67 S.W.3d 192, 201 (Tex. Crim. App. 2001). The testimony was brief: Albarado's

---

[3] Albarado has asserted claims within his argument on this point of error that certain evidence was not admissible and that the police investigation was not full and complete, as well as other assertions not germane to the point. We do not address those miscellaneous assertions. *See* TEX. R. APP. P. 33.1.

testimony regarding the tattoo was less than six pages, and Deputy Birchum's testimony was five pages. A review of this record reveals that the probative value of the evidence was not outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403.

Next, under his sixth point, Albarado again complains about the testimony regarding his escape. We have already held under another point that this evidence was admissible. *See Foster*, 779 S.W.2d at 859. Albarado devotes a good deal of space in this point to a discussion of making a harm analysis. However, we have found no error in the admission of the evidence, and we need not perform a harm analysis.

Under this same point, Albarado makes the argument that the evidence is legally and factually insufficient to support the verdict.

In a legal sufficiency review, we view all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979); *Prible v. State*, 175 S.W.3d 724, 730-31 (Tex. Crim. App. 2005).

In a factual sufficiency review, we consider all the evidence in a neutral light. *Prible*, 175 S.W.3d at 730-31. The evidence may be factually insufficient if, when considered by itself, the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust. *Id*. at 731. The evidence also may be factually insufficient where the evidence both supports and contradicts the verdict – the contrary evidence may be strong enough the beyond-a-reasonable-doubt standard could not have been met. *Id*. In conducting a factual sufficiency review, we give deference to the factfinder so that we do not substitute our own judgment. *Jones v. State*, 944 S.W.2d 642, 648 (Tex. Crim. App. 1996). We must consider the evidence that Albarado claims is most important in allegedly undermining the jury's verdict. *Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003). It is within the province of the factfinder to resolve any conflicts and inconsistencies in the evidence. *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995). And, the factfinder is free to believe or disbelieve any part or all of a witness's testimony. *Jones v. State*, 984 S.W.2d 254, 258 (Tex. Crim. App. 1998).

In this case, the State was required to prove that Albarado intended to cause serious bodily injury to the victim, that he committed an act clearly dangerous to human life, and that he thereby caused the victim's death. The evidence shows that, after a night of smoking marihuana, taking illegal drugs, and drinking alcohol, Albarado was involved in a fight. Prior to the fight, he had

11

obtained a pistol-gripped shotgun and had loaded it with 00 buckshot. During the fight, Albarado got the shotgun; fired a warning shot into the air; and, as neighbor William Barlow testified, headed toward the victim and others as they were trying to run away. Albarado also testified that, as he went after the victim and the others, he was firing the shotgun – from the hip – in their direction and that he shot the victim in the back.

It is undisputed that Albarado shot the victim with a shotgun. It is also undisputed that the victim died from the gunshot wounds. A rational juror could determine that shooting a shotgun in the direction of persons who are attempting to get away is an act clearly dangerous to human life. The factfinder may infer intent to cause serious bodily injury from any facts in evidence that, in its mind, prove the existence of such intent, as the use of a deadly weapon. *See Walker v. State*, 440 S.W.2d 653, 657 (Tex. Crim. App. 1969). A "firearm" is a deadly weapon per se. *Trevino v. State*, 228 S.W.3d 729, 758 (Tex. App.—Corpus Christi 2006, pet. ref'd). When the weapon used in effecting an unlawful killing is a deadly weapon per se, the intent to kill is presumed. *Walker*, 440 S.W.2d at 657. The jury may also infer an intent to cause serious bodily injury from the acts or words of the accused, the manner in which the offense was committed, and the nature of the wounds inflicted. *Payne v. State*, 194 S.W.3d 689, 694 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). Under the well-known standards that we have outlined, we hold that the evidence is both legally and factually sufficient to support the verdict in this case. Albarado's sixth point is overruled.

We affirm the judgment of the trial court.


JIM R. WRIGHT
CHIEF JUSTICE


July 16, 2009

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.

12