# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00494-CR

**Glynn Edward Tetens, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF BELL COUNTY, 27TH JUDICIAL DISTRICT
## NO. 54857, HONORABLE JOE CARROLL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Glynn Edward Tetens of capital murder and sentenced him to life in prison. He appeals in two issues, contending that the evidence is insufficient to link him to the location of the murder and that the evidence is factually insufficient to support the jury's verdict. We affirm the judgment of conviction.

On February 18, 1990, Gary Tompkins was shot and killed at the River Forest Smorgasbord restaurant in Belton, Texas, which he had purchased from his mother, Tetens, and Lupe Mendoza.[1] The details of Tompkins's purchase of the restaurant are somewhat unclear and are not necessary to our consideration of this case. There was evidence that Tompkins originally paid Tetens $1,000 a month for Tetens's interest in the restaurant, but when the restaurant began to have financial

---

[1] Tetens was not indicted until June 2003, thirteen years after Tompkins's murder.

troubles, Tompkins significantly reduced his monthly payments to Tetens. For example, in October 1989, he paid Tetens $56, and in January 1990, he paid Tetens $115. At the time of his death, Tompkins owed a total of about $200,000 to the restaurant's former owners, including about $8,000 to Tetens. Diane Tompkins testified that the proceeds from Tompkins's life insurance were used to pay debts and taxes. After Tompkins's death, Diane was advised to sell the restaurant.

On February 18, Diane Tompkins spoke to her husband between 10:30 and 11:00 p.m., and he said he would be home shortly.[2] About thirty minutes later, Diane called the restaurant but got no answer. She began to worry and soon drove to the restaurant to check on her husband. When she arrived, she saw her husband's car in the parking lot, but the restaurant was dark. She called the police, and when they arrived, they discovered that the front door was unlocked. Diane testified that her husband usually locked the front door when he was alone at the restaurant at night, but said he would open the door for someone he knew. The police found Gary Tompkins dead in his office, shot five times; five empty shell casings were found at the scene. Two bank bags, each containing about $2,000, were found in the office, but the receipts from February 17 and 18 were missing, including about $6,500 in cash. Leeann Ballard testified that she drove past the restaurant between 10:00 and 11:00 p.m. on the night of the murder and saw a man in his late 40s, wearing a black jacket and brown pants, standing outside and looking in the restaurant's windows.

---

[2] Diane Tompkins believed she spoke to Tompkins at about 11:00 p.m. Their daughter told the police that she thought it was closer to 10:30 p.m.

2

The police interviewed the three employees who were the last to leave the restaurant on February 18. They said that when they left at about 9:45 p.m., Tompkins was in his office counting receipts. Arthur White, one of the three, testified that when he left the restaurant, he saw two trucks in the parking lot. One was a "beige or like brown/beige/brown" Ford and the other was a dark blue or black Chevrolet with a light blue stripe. Tetens drives a Ford truck that witnesses described as two-toned, with beige in the middle and a darker color on the top and bottom. Shown a picture of Tetens's truck, White said the Ford he saw was the same body style, but was brown, not maroon or red, as Tetens's appeared to be. In his statement to the police taken at the time of the murder, White said the Ford was "tan/darker/darker," but at trial he insisted that it was tan and brown, not maroon or red.

During their investigation, Tetens's ex-wife told the police that Tetens, who had been several months behind in child support, sent her $800 on February 21; Tetens made the payments with two money orders purchased on February 20. The police discovered that Tetens also purchased two other money orders totaling about $1080 and payable to Ford Motor Credit Company. On March 4, the police searched Tetens's property and found a bullet that was the same common brand and caliber as those found at the crime scene. In Tetens's truck, they found a pair of brown pants and a gray jacket in a dry cleaners' bag with a receipt showing that the clothes were cleaned on February 21 and a traffic warning given to Tetens at 11:53 p.m. on February 18 at mile marker 12 on State Highway 95, north of Taylor, Texas.

The police asked Tetens to submit to an interview, and he agreed. Tetens told the police that on the night of the murder he was in Belton, picking up mail from a post office box. He

3

admitted that he drove past the restaurant while he was in Belton, but he denied stopping or going inside. He described the route he drove to and from Belton, and said that he was given the warning just north of Taylor at about 11:50 p.m. One police officer testified that it would probably take about forty-five or fifty minutes to travel from Belton to Taylor along SH-95; another drove from the restaurant to the approximate location where Tetens was stopped and said it took him thirty-two minutes to make the drive. Tetens told the police that although there was another more direct route to Belton, the route he took along SH-95 had less traffic. Tetens used the ticket to show that he could not have been in Belton at the time the murder was committed, arguing that he could not have killed Tompkins sometime after 11:00 p.m., when Diane Tompkins testified she last spoke to her husband, and then driven almost to Tyler within fifty minutes. The State, however, argued that the ticket tied Tetens to the area at the time of the murder.

When questioned about his financial situation, Tetens said that he had very little money. He told the police that he won the money he used for his recent child support and car payments by playing poker, but he refused to tell the police with whom he had been gambling. During the investigation, the police confirmed that Tetens was known for gambling. The police said that Tetens was cooperative when interviewed, but they noted that Tetens refused to say from whom he had won the $2,000 in a poker game, initially failed to tell them about the warning ticket, and denied owning any .25 caliber ammunition.

The police did not find Tompkins's blood on Tetens's clothing and the fibers found under Tompkins's fingernails did not match anything tied to Tetens. Nor did the police find soil consistent with the crime scene or gunpowder residue during their search of Tetens and his property.

4

The police did not recover any of Tetens's fingerprints at the scene. In other words, investigators did not find physical evidence directly linking Tetens to the crime scene.

The police determined that a .25 caliber Raven model pistol was the murder weapon, and learned that in March 1988, Tetens had pawned a .25 caliber Raven handgun, serial number 340481. Three weeks later, he returned and redeemed it, along with some ammunition. When questioned, Tetens told the police that the gun had since been either lost or stolen. In 1999, a man working on an expansion project on SH-95 found a .25 caliber Raven pistol, serial number 340481; the gun was found in a ditch "in close proximity" to the location where Tetens received his warning ticket on February 18, 1990. The gun was rusty and covered in mud and could not be fired. However, a firearms expert used negative imaging techniques and concluded that the gun found in the ditch was the same gun that fired the five empty shell casings found at the crime scene. He further concluded that there was a "very high likelihood" that the same gun had fired the five shots that killed Tompkins, although he could not be absolutely certain.

Jesse Olivarez worked at the restaurant and was friendly with Tetens. He testified that sometime before the murder, Tetens borrowed his keys to the restaurant to make a copy and on one or two occasions entered the restaurant after hours when almost everyone other than Olivarez was gone. Olivarez did not know how Tetens entered "[u]nless he used a key." Once, Tetens told Olivarez that he was there to collect money from Tompkins, and another time he said he was there to "collect some papers." Olivarez also testified that one night about two weeks before the murder, he saw someone "snooping" in the restaurant's parking lot. When he approached, he saw it was

5

Tetens, who said he was there to "collect some money from Tompkins." The restaurant's locks were changed in February 1990, and Tetens's copy would not have worked on the new locks.

During their investigation, the police learned that one of the restaurant employees had owned a .25 caliber handgun, but he said that he traded it for a car about a year before the murder. Texas Ranger James Miller testified that the Rangers investigated Kenneth Kocher, who said that he and two other men, including a restaurant employee, had discussed robbing the restaurant, saying they would have to kill Tompkins in the process. Miller said that Kocher was known to be untruthful and that his statements were disregarded as "drunk talk." Tetens called Mary Lou Wallace as a defense witness. Wallace lived near the restaurant, and she testified that at about 8:30 p.m. on February 18, a strange man tried to force his way into her house, although he did not display or threaten her with a gun. She testified that she called the police to report the incident, but police call logs showed that Wallace made her report on February 17, not February 18.

Tetens called Janet Lynn to testify for the defense. Lynn lived behind the restaurant and testified that on the night of February 18, she saw an unfamiliar car in the restaurant's parking lot; she noticed the car because her grandmother used to have a similar car. Lynn, who was a bartender at a nearby bar, also testified that Tompkins's brother Kenny frequently came to the bar and, when intoxicated, was "mouthy" and a "braggart." About three or four months after Tompkins was killed, Kenny came to the bar and was "very belligerent, and very, very drunk." He told her that "one of the greatest pleasures in the world" was "[l]ooking down the barrel of a gun pointed at [his] brother." Asked if she knew Kenny's current whereabouts, she said that she thought he was dead. Lynn testified that she never told the police about Kenny's statement, because, "[I]t was just him and

6

me in there, and who's going to believe me?  We were talking about a reputable family."  After Tetens rested, the State called a rebuttal witness who testified that about five months before trial, Lynn told her that Tompkins's brother David, not Kenny, had confessed to her that he had committed the murder and that she had already told the police about David's statement.

Tetens was indicted for the murder while committing or attempting to commit robbery.  In his first issue, Tetens argues that the wording of the indictment "establishes that the State must prove by reliable evidence 'some' affirmative link between [Tetens] and the commission of the offense," such as eyewitness testimony, possession of the stolen money, possession of the murder weapon, or a confession.  Tetens contends that because the conviction was based on circumstantial evidence, we should apply the "reasonable hypothesis" analytical construction and ensure that the evidence excluded "every other reasonable hypothesis except the guilt of the accused."  However, the court of criminal appeals has overruled the reasonable hypothesis analysis.  *Geesa v. State*, 820 S.W.2d 154, 159-61 (Tex. Crim. App. 1991).

Instead, in evaluating the legal sufficiency of the evidence, we examine all of the evidence in the light most favorable to the verdict and ask whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *Burden v. State*, 55 S.W.3d 608, 612 (Tex. Crim. App. 2001).  In reviewing the factual sufficiency, we view the evidence in a neutral light and will set aside a verdict only if the supporting evidence is so weak that the verdict is clearly wrong or the contrary evidence is so strong that the jury could not have found all the elements of the crime beyond a reasonable doubt.  *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005).  A verdict is clearly wrong and unjust if the "jury's finding is 'manifestly unjust,'

7

'shocks the conscience,' or 'clearly demonstrates bias.'" *Id*. (quoting *Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997)).

We apply the same standard to both direct and circumstantial evidence cases. *Burden*, 55 S.W.3d at 613; *Barnes v. State*, 62 S.W.3d 288, 297 (Tex. App.—Austin 2001, pet. ref'd). We determine the sufficiency of the evidence by viewing the cumulative effect of all of the evidence, not each fact in isolation. *Barnes*, 62 S.W.3d at 297. The jury is the sole judge of the weight and credibility of the witnesses and their testimony. *Id*. at 298. Thus, the jury may accept or reject all or any of the evidence presented by either side, may draw reasonable inferences from the evidence, and must reconcile any evidentiary conflicts. *Id*.

Although the police did not find any physical evidence at the crime scene that led them to Tetens, the evidence is nonetheless legally and factually sufficient to support the jury's verdict. First, Tetens's gun, which he claimed had been lost or stolen, was determined to have fired the five empty shell casings found at the crime scene and was probably the gun that fired the bullets taken from Tompkins's body. That gun was found nine years after the offense in a ditch very near where Tetens was known to have driven on the night of the murder. Tetens was stopped and received a warning ticket in the general area about fifty minutes after Tompkins last spoke to his family. Tetens admitted to the police that on the night of the murder he was in Belton and drove by the restaurant, although he denied stopping. A witness saw someone approximately Tetens's age, wearing brown pants and a black jacket, looking in the windows of the restaurant, and Tetens sent brown pants and a gray jacket to the dry cleaners several days after the murder. Tompkins owed Tetens a substantial amount of money, and Tetens had two or three times come to the restaurant after

8

hours to attempt to collect money from Tompkins. Tetens was in debt and behind on child support payments, but two days after the murder was able to buy approximately $2,000 in money orders. Although he claimed to have won the money in poker games, he would not provide any more specifics to account for the money. Finally, a truck resembling Tetens's truck was seen in the parking lot of the restaurant on the evening of the murder, although there was some disagreement as to whether the truck was the same color as Tetens's truck. The jury was entitled to weigh the evidence and draw reasonable inferences therefrom. *See Barnes*, 62 S.W.3d at 298. The State was not required to produce physical evidence directly placing Tetens at the scene, such as fingerprints or an eyewitness. The evidence, when viewed in the light most favorable to the jury's verdict, is sufficient to support the finding of guilt.

Even when viewed in a neutral light, the evidence is sufficient. A nearby neighbor said that a stranger attempted to force his way into her house, but that incident was determined to have happened the day before the murder. One of Tompkins's brothers reportedly made a statement that could be taken as a confession that he committed the murder, but Lynn did not relay it to the police, and another witness testified that Lynn told her a different brother had made that statement. Another man, known for being untruthful, told the police that he had discussed robbing the restaurant, but the police decided to disregard him as a suspect. It was for the jury to weigh all of the evidence and determine the weight and credibility to assign to the testimony. *See id*. Viewed as a whole, rather than in isolation, and despite a lack of physical evidence tying Tetens directly to the crime, we cannot hold that the jury's verdict is manifestly unjust or shocks the conscience. *See Prible*, 175 S.W.3d at 731.

9

The evidence is both legally and factually sufficient to tie Tetens to the crime and to support the jury's verdict. We therefore overrule Tetens's issues on appeal and affirm the judgment of conviction.

_____

David Puryear, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:   June 2, 2006

Do Not Publish