Affirmed and Memorandum Opinion filed May 29, 2008








Affirmed and Memorandum Opinion filed May 29, 2008.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00377-CR

____________

 

JOSEPH DENNIS LEWIS, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 178th
District Court

Harris County, Texas

Trial Court Cause No. 1060932

 



 

M E M O R A N D U M   O P I N I O N

A jury found appellant, Joseph Dennis Lewis, guilty of
murder and assessed punishment at life in the Texas Department of Criminal
Justice, Institutional Division.  See Tex. Penal Code Ann. ' 19.02 (Vernon
2003).  On appeal, appellant challenges the sufficiency of the evidence.  His
claims concern three categories of sufficiency: accomplice-witness
corroboration, legal sufficiency, and factual sufficiency.  We affirm.








Factual and Procedural Background

Michael Gutierrez and Robert Baker had been friends since
childhood.  Even after Baker moved from Houston to Florida, he and Gutierrez
kept in contact.  On one of his trips back to Houston, Baker met Clay
Garretson.  Approximately once a month, Baker would return to Houston, and he
and Garretson would hang out together.  Baker often told Garretson and his
friends that he had a friend who could get them any kind of drug they wanted. 
Baker was referring to Gutierrez.

In July 2005, Garretson met Shelton Strawder through a
mutual friend.  In August 2005, Garretson also met a close friend of Strawder=s known as ACheese,@ who was later
identified as appellant.  Sometime around the middle of August 2005, Strawder
asked Garretson to call Baker and get him hooked up with Baker=s friend who could
get him drugs.  Garretson called Baker, and Baker put Garretson in contact with
Gutierrez.

After Baker put Garretson and Gutierrez in contact,
Strawder and appellant met with Gutierrez to transact the drug deal.  Strawder
bought cocaine from Gutierrez with the intent of cooking it into crack. 
Gutierrez told Strawder the cocaine was raw, but when Strawder attempted to
cook the cocaine in front of Gutierrez, he ruined it.  Strawder became angry
and did not want to pay Gutierrez for the ruined cocaine, but Gutierrez
insisted he pay.  Strawder reluctantly paid Gutierrez $500, but he called
Garretson and demanded Garretson either pay him the $500 or call Baker and
complain.

At Strawder=s request, Garretson called Baker and told
him the drugs Gutierrez sold were bad.  Garretson told Baker that Strawder was
upset, and he asked Baker to talk with Gutierrez.  Baker told Garretson he
would talk to Gutierrez, but according to Garretson, Gutierrez never made the
situation right.








In the mean time, Strawder, his girlfriend, and his baby
moved in with Garretson.  Strawder did not pay rent, did not pay for food, and
did not have a car.  According to Garretson, they were originally only going to
stay for a couple of weeks, but they always had an excuse as to why they could
not move out.  Eventually, Garretson began spending most of his time at his
girlfriend=s apartment, partially due to the cramped living
conditions at his own apartment.  

Sometime in February 2006, Strawder called Garretson and
told him a friend needed eight ounces of cocaine.  Garretson initially ignored
Strawder=s request, but
Strawder called again about a week later and asked if Garretson could get the
cocaine.  Garretson did not really want to be a part of Strawder=s drug deal, but
he decided he would help Strawder because Strawder told Garretson he would use
the money to get his own apartment.

On February 22, 2006, Garretson called Gutierrez and asked
if he was interested in selling some cocaine.  Gutierrez told Garretson he was
out of town, but he would call Garretson when he arrived back in Houston. 
Garretson relayed the information to Strawder, but Garretson did not tell
Strawder he was dealing with Gutierrez.  At this point, Garretson knew Strawder
wanted the cocaine for a friend, but Garretson did not know who the friend
was.  When Gutierrez arrived back in Houston, Garretson went to Gutierrez=s house and
Gutierrez quoted a price.  Garretson then informed Strawder of the price, which
Strawder agreed to pay.  Gutierrez told Garretson it would take him
approximately an hour to get the cocaine, and he would call Garretson when he
was ready.  

After Gutierrez obtained the cocaine, the four men
discussed arrangements for the exchange.  Gutierrez originally suggested they
all meet at Gutierrez=s house, but Garretson did not want to
make the exchange there because he did not want Strawder and his friend to know
where Gutierrez lived.  Instead, Gutierrez and Garretson decided to meet up at
the Marq E Entertainment Complex off of Interstate-10.  Garretson=s plan was to meet
Gutierrez and the two of them would meet Strawder and his friend at a different
location.  Garretson felt there would be too many people at the entertainment
complex to make the exchange.








Garretson arrived at the complex approximately fifteen to
twenty minutes before Gutierrez.  While Garretson was waiting for Gutierrez,
appellant called him and asked Garretson if he could get sixteen ounces of
cocaine instead of eight.  Garretson was surprised when appellant called him
because, up until this point, he had only communicated with Strawder. 
According to Garretson, he would not have set up the deal if he would have
known appellant was involved.  Garretson wanted to cancel the deal, but
ultimately decided to go through with it.  At this point, Garretson called
Gutierrez and asked if he could get sixteen ounces instead of eight.  Gutierrez
told Garretson he could get twelve ounces, so Garretson relayed this
information to appellant.  Appellant agreed to take the twelve ounces. 
Garretson also told appellant he was meeting Gutierrez at the entertainment
complex, but he wanted the two of them to meet appellant at a different
location somewhere off of Interstate-10, such as a gas station.

Some time around 8 or 9 p.m., Gutierrez arrived at the entertainment
complex and pulled up next to Garretson=s car.  Gutierrez
got into Garretson=s car, and the two discussed where they
should meet appellant.  Garretson then called appellant and told him where they
wanted to meet, but appellant told Garretson to stay where he was because
appellant was already at the entertainment complex.  Garretson and Gutierrez
waited, and appellant pulled up in a white car behind Garretson=s car, blocking
them in.  Appellant then got into the backseat of Garretson=s car behind the
driver=s seat.  

As appellant got into the car, he introduced himself to
Gutierrez as Cheese, and he asked Gutierrez if the cocaine was raw.  Garretson
assumed appellant asked if the cocaine was raw because appellant wanted to cook
it into crack, and he did not want to ruin it like the first time.  Gutierrez
told appellant the cocaine was raw and offered appellant a sample of it. 
Gutierrez then handed the package to appellant, and appellant started to unwrap
it.  At this point, Garretson was looking straight forward, allowing Gutierrez
and appellant to take care of their business.  The next thing Garretson heard
was a shot  fired from inside the car.  As Garretson turned to see what
happened, he saw Gutierrez attempting to get out of the 








car
and run, and then he heard a second shot fired.  According to Garretson,
Gutierrez never pulled any kind of weapon on appellant.  

After Gutierrez got out of the car, appellant put the gun
to Garretson=s head and told him to leave.  Appellant warned
Garretson if he made it look obvious, he would shoot him as well.  By this
point, the white car appellant arrived in had left the scene, so Garretson was
able to back out and leave the entertainment complex.  Due to construction,
Garretson could not get onto Interstate-10, so he headed west down the feeder
road. Garretson overheard appellant tell someone over  his cell phone that Ahe got him a good
one.@  As Garretson
pulled up to the second stoplight on the feeder road, appellant got out of
Garretson=s car and jumped into the car behind it.  According to
Garretson, the other car appeared to continue driving west, but Garretson
turned left and pulled into an apartment complex in order to regroup.  Out of
fear and panic, Garretson decided not to call the police.

Garretson ultimately decided to get rid of his car, so he
left it at appellant=s apartment complex with the hope that the
police would find it there.  Garretson=s girlfriend
picked Garretson up at the complex and took him back to her apartment. 
According to Garretson, he never really looked at his car to see if it had any
blood in it.  It was not until later that evening, after Garretson saw the
news, that he discovered Gutierrez had died.  Garretson still did not call the
police because he was scared of  appellant..

During the weeks after the shooting, Strawder called
Garretson five or six times inquiring into whether Garretson had spoken to the
police.  During one of those conversations, appellant warned Garretson not to
talk to the police.  Around the first of March 2006, Garretson had to go to his
apartment to pick up some items for school, and when he arrived, Strawder,
appellant, and three other people were at his apartment.  Again, appellant
asked if Garretson had gone to the police and warned him A[y]ou wouldn=t want me to have
to do you like I did Mike.@ 








On March 8, 2006, Sergeant Guillermo Gonzalez contacted
Garretson and asked if he would come to the police station.  Garretson met with
the police later that day and told them what happened.  Garretson also provided
the address of where Strawder and appellant were staying.  On that same day,
Garretson picked appellant out of a photo spread.  According to Garretson, he
was one hundred percent sure the person in the photo was the person he knew as
Cheese and was the person who shot Gutierrez on February 22, 2006.  Garretson
agreed to testify for the State, and during trial, he provided testimony
supporting the above mentioned facts.  

Scott McDonald, a youth-worship pastor at Fairmont Park
Baptist Church, was at the entertainment complex the night Gutierrez was
killed.  McDonald testified he was in the parking lot of the Improv Comedy
Club, which is located in the entertainment complex, talking to a group of
friends when he heard a gunshot.  McDonald testified he was sure he heard at
least one gunshot, but due to all of the confusion, he was unsure whether there
was a second shot fired.  As McDonald looked in the direction of the gunshot,
he noticed a man stumbling.  McDonald testified the man took a couple of steps
forward and then violently fell face first onto the concrete.  McDonald
testified that, as he was rushing toward the man, he called the police. 
According to McDonald, the man was breathing heavily and struggling by the time
McDonald got to him, and by the time the ambulance arrived, the man had died. 








Gonzalez, a sergeant with the Houston Police Department,
was called to the scene the
night of the shooting.  Gonzalez testified he did not recover any bullets or a
gun from the scene, but he stated the police often do not find a gun at the
scene of a crime.  During his investigation, a friend of Gutierrez=s gave him
Garretson=s name.  Gonzalez testified he tracked Garretson down
and asked him to come to the police station.  According to Gonzalez, Garretson told him Cheese shot
Gutierrez.  With this information, Gonzalez determined Cheese was the
appellant.  He then obtained a picture of appellant, and had another officer
compile a photo spread with appellant=s picture in it. 
Gonzalez also testified Garretson provided some phone numbers, and with this
information, Gonzalez requested the cell phone records for Gutierrez, Strawder,
and appellant.  According to Gonzalez, the cell phone records showed appellant=s cell phone was
in the quadrant of the entertainment complex at the time of the murder.  On
cross-examination, however, Gonzalez admitted the phone records did not contain
the content of the conversations.

Gonzalez also testified he obtained Garretson=s car and sent it
to the vehicle-exam building for inspection.  The inspection revealed there was
blood in the front passenger-side door jam; however, Gonzalez learned from
Strawder that Strawder had cleaned the car with Clorox before it was
discovered.  Gonzalez testified appellant knew Strawder had cleaned the car. 
Gonzalez also testified from his investigation, he did not believe Garretson
was involved with the murder other than setting up the drug deal.

Sergeant Norman Kiesewetter of the Houston Police
Department testified he was asked to examine Garretson=s car for
fingerprints and blood sometime in March 2006.  Kiesewetter testified he found
some blood in the right door jam, and he lifted fingerprints from the left-door
window in the backseat.  Kiesewetter admitted on cross-examination he did not
process the car for gun-powder residue.  Rafael Saldivar, an officer with the
Houston Police Department, testified he performed an analysis on the
fingerprints Kiesewetter lifted, and they were not a match for appellant. 
However, Saldivar testified it was still possible for appellant to have been in
the car and not left any fingerprints. 

Stephen Wilson of the Harris County Medical Examiner=s Office conducted
the autopsy on Gutierrez.  According to Wilson, the gunpowder found on
Gutierrez=s undershirt and body suggested Gutierrez was within
close proximately to the shooter.  Wilson testified the cause of Gutierrez=s death was a
gunshot wound, and his death was consistent with someone shooting him with a
deadly weapon.  While Wilson testified Gutierrez=s wound was
consistent with someone shooting him from the backseat of the car, he also
admitted on cross-examination it was possible the shooter was in the front seat
of the car.








Lastly, Breck McDaniel, a sergeant with the Houston Police
Department, testified regarding his special training in telephone-date
investigation.  According to McDaniel, by looking at the cell-phone records for
a particular number, he could determine an accurate approximate geographic area
that the phone was in when the call began and when it ended.  McDaniel
testified he examined the records for a cell phone registered to appellant. 
McDaniel testified during the time of the murder, appellant=s phone was
located in the area of the murder.  According to McDaniel, the next call made
from appellant=s phone indicated the phone was heading west on
Interstate-10.  McDaniel explained that typically a cell phone would use the
closest tower, but based on the network traffic, the system sometimes routed a
call to a tower further away.  McDaniel also testified the records indicated
Garretson and appellant called each other back and forth a number of times on
the day of the murder.  On cross-examination, McDaniel admitted he had no way
of telling what person was actually using the phone at the time of the call,
and that people often lost, misplaced, or allowed others to borrow their
phones.

Appellant did not testify on his own behalf and he did not
call any witnesses.  The jury subsequently found appellant guilty of murder and
assessed punishment at life in the Texas Department of Criminal Justice,
Institutional Division.  This appeal followed.

Discussion

A.      Is the
Evidence Sufficient to Corroborate the Accomplice-Witness Testimony?








In his third issue, appellant argues the State=s corroborative
evidence used to support the testimony of the accomplice witness was not
adequate to sustain his conviction for murder.  According to appellant,
Garretson was an accomplice witness, and the State failed to meet the proper
standard for corroborating his testimony.  In response, the State argues
Garretson was not an accomplice to murder; therefore, the State was not
required to corroborate his testimony.  Thus, we must first determine whether
Garretson is an accompliceBeither as a matter of law or of factBto the murder or a
lesser-included offense of the murder.

1.       Applicable
Law

Article 38.14 of the Texas Code of Criminal Procedure
states: AA conviction
cannot be had upon the testimony of an accomplice unless corroborated by other
evidence tending to connect the defendant with the offense committed; and the
corroboration is not sufficient if it merely shows the commission of the
offense.@  Tex. Code Crim.
Proc. Ann. art. 38.14 (Vernon 2005).  This accomplice-witness rule creates a
statutorily imposed review and is not derived from federal or state
constitutional principles that define the legal and factual sufficiency
standards. Druery v. State, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007). 


An accomplice is someone who participates with the
defendant before, during, or after the commission of a crime and acts with the
required culpable mental state.  Id.  To be considered an accomplice
witness, the witness=s participation with the defendant must
have involved some affirmative act that promotes the commission of the offense
with which the defendant is charged.  Id.  A witness is not an
accomplice witness merely because he or she knew of the offense and did not
disclose it, or even if he or she concealed it.  Id.  In addition, the
witness=s mere presence at
the scene of the crime does not render that witness an accomplice witness.  Id. 
And complicity with an accused in the commission of another offense apart from
the charged offense does not make that witness=s testimony that
of an accomplice witness.  Id.  In short, if the witness cannot be
prosecuted for the offense with which the defendant is charged, or a
lesser-included offense of that charge, the witness is not an accomplice
witness as a matter of law.  Id.








A trial judge, therefore, has no duty to instruct the jury
that a witness is an accomplice witness as a matter of law unless there exists
no doubt that the witness is an accomplice.  Id.  If the evidence
presented by the parties is conflicting and it remains unclear whether the
witness is an accomplice, the trial judge should allow the jury to decide
whether the inculpatory witness is an accomplice witness as a matter of fact
under instructions defining the term Aaccomplice.@  Id. at
498B99.  However, as
with an accomplice as a matter of law, there must still be some evidence of an
affirmative act on the part of the witness to assist in the commission of the
charged offense before such an instruction is required.  Id. at 499.

2.       Analysis








Here, Garretson was not an accomplice as a matter of law or
as a matter of fact.  Garretson was not indicted for the murder or a
lesser-included offense of the murder, and the evidence does not show Garretson
could have been so charged.  A review of the record reveals testimony was
elicited regarding Garretson=s actions before, during, and immediately
after the murder as follows: (1) sometime during the middle of February,
Strawder contacted Garretson and asked if he could get eight ounces of cocaine;
(2) Garretson did not want to help Strawder at first, but Strawder told
Garretson he would use the money to get his own apartment; (3) Garretson
contacted Gutierrez and asked if he would be interested in selling eight ounces
of cocaine; (4) Garretson did not initially tell Strawder he had asked
Gutierrez to provide the cocaine; (5) Gutierrez suggested the four men meet at
his house, but Garretson did not want to make the exchange there because he did
not want Strawder and his friend to know where Gutierrez lived; (6) Garretson
decided to meet Gutierrez at the entertainment complex and the two of them
would meet Strawder and his friend at a different, less public location to
exchange the drugs; (7) appellant called Garretson while he was waiting at the
entertainment complex and asked him if he could get sixteen ounces instead of
eight; (8) Garretson was surprised when appellant called him, and Garretson
wanted to cancel the deal; (9) Garretson would not have set up the deal had he
known appellant was involved; (10) Garretson told appellant he was meeting
Gutierrez at the entertainment complex but wanted to meet appellant in a
different location; (11) appellant told Garretson to stay at the entertainment
complex; (12) after appellant fired the shots, he put the gun to Garretson=s head, instructed
Garretson to leave, and instructed Garretson not to make it obvious or he would
shoot him too; (13) after appellant got out of Garretson=s car, Garretson
took the car to appellant=s apartment complex in hopes the police
would find it there; (14) out of fear and panic, Garretson did not call the
police; (15) Garretson did not know Gutierrez died until he saw the news later
that evening; (16) appellant told Garretson he would kill him if he talked to
the police; (17) when approached by the police, Garretson went to the station
and provided the police information regarding the murder; and (18) Gonzalez
testified that, based on his investigation, he did not believe Garretson was
involved with the murder other than setting up the drug deal.

This evidence does not indicate Garretson performed any
affirmative act to assist in the commission of the murder or a lesser-included
offense of the murder; nor does the evidence indicate Garretson possessed the
required culpable mental state for the offense of murder or a lesser-included
offense of murder.  Garretson=s mere presence at the scene of the crime
does not render him an accomplice, and he is not an accomplice merely because
he knew of the offense and did not disclose it to the police.  See id.
at 498.  Furthermore, Garretson=s complicity with appellant in the
commission of another offense apart from the charged offense, in this case
dealing drugs, does not make Garretson=s testimony that
of an accomplice.  See id.  We conclude the evidence fails to show
Garretson was an accomplice as a matter of law or an accomplice as a matter of
fact.  See id. at 497B500 (holding two witnesses were not
accomplices to capital murder as a matter of law or fact even though they were
present when the crime occurred, the defendant told both witnesses he was going
to kill the victim but the witnesses did not believe him, neither witness
warned the victim, one of the witnesses assisted in disposing of the body, and
neither witness went to the police immediately after the crime); Caraway v.
State, 550 S.W.2d 699, 702B03 (Tex. Crim. App. 1977) (holding a
witness was not an accomplice to murder even though he was a party to the theft
of the automobile and rifle shortly before the murder, and he was present
during the crime).  Therefore, we need not review Garretson=s testimony
through the lens of the accomplice-witness rule to determine if the State
introduced sufficient non-accomplice corroborating evidence.  See Druery,
225 S.W.3d at 500.  We overrule appellant=s third issue.








B.      Is the
Evidence Legally and Factually Sufficient to Support Appellant=s Conviction?

In his first two arguments, appellant argues the evidence
is legally and factually insufficient to support the murder conviction.  While
appellant=s brief included the proper standards of review for
legal and factual sufficiency, appellant failed to include any arguments as to
how or why the evidence is insufficient.  Technically, appellant has waived
this complaint on appeal.  See Tex. R. App. P. 38.1(h); McDuff v.
State, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997) (holding a factual
sufficiency claim that merely includes a general discussion of the evidence but fails
to include any argument as to how or why the evidence is insufficient under a factual
sufficiency standard is inadequately briefed).  However, even assuming
appellant did not waive his arguments, the evidence is legally and factually
sufficient to support his conviction.

1.       Standard
of Review

In a legal sufficiency review, we view all the evidence in
the light most favorable to the verdict and determine whether any rational
trier of fact could have found the essential elements of the crime beyond a
reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct.
2781, 2789, 61 L. Ed. 2d. 560 (1979); Salinas v. State, 163 S.W.3d 734, 737 (Tex. Crim.
App. 2005).  The jury, as the sole judge of the credibility of the witnesses,
is free to believe or disbelieve all or part of a witness=s testimony.  Jones v. State,
984 S.W.2d 254, 257 (Tex. Crim. App. 1998).  We do not engage in a second
evaluation of the weight and credibility of the evidence, but only ensure the
jury reached a rational decision.  Muniz v. State, 851 S.W.2d 238, 246
(Tex. Crim. App. 1993); Harris v. State, 164 S.W.3d 775, 784 (Tex. App.CHouston [14th Dist.] 2005, pet. ref=d).








In a
factual sufficiency review, we consider all the evidence in a neutral light.  Prible
v. State, 175 S.W.3d 724, 730B31 (Tex. Crim. App. 2005).  The
evidence may be factually insufficient in two ways.  Id. at 731.
 First, when considered by itself, evidence supporting the verdict may be
so weak the verdict is clearly wrong and manifestly unjust.  Id.  Second,
where the evidence both supports and contradicts the verdict, the contrary
evidence may be strong enough the beyond-a-reasonable-doubt standard could not
have been met.  Id.  In conducting a factual sufficiency review, we must
employ appropriate deference so we do not substitute our judgment for that of
the fact finder.  Jones v. State, 944 S.W.2d 642, 648 (Tex. Crim. App.
1996).  Our analysis must consider the evidence appellant claims is most
important in allegedly undermining the jury=s verdict.  Sims v. State, 99
S.W.3d 600, 603 (Tex. Crim. App. 2003). 

2.       Analysis

A person commits the offense of murder if he intentionally
or knowingly causes the death of an individual, or intends to cause serious
bodily injury and commits an act clearly dangerous to human life that causes
the death of an individual.  Tex. Penal Code Ann. ' 19.02(b)(1)B(2).

The evidence presented through Garretson=s testimony, as
detailed in the factual section above, is sufficient to support appellant=s conviction. 
Garretson testified regarding the events that occurred before, during, and
after the shooting of Gutierrez.  Additionally, Garretson picked appellant out
of a photo spread and testified he was one hundred percent sure the person in
the photo was the person he knew as Cheese and was the person who shot
Gutierrez on February 22, 2006.  The testimony of one eyewitness is sufficient
to support a jury=s verdict.  Aguilar v. State, 468
S.W.2d 75, 77 (Tex. Crim. App. 1971); Walker v. State, 180 S.W.3d 829,
832 (Tex. App.CHouston [14th Dist.] 2005, no pet.).  Therefore,
Garretson=s testimony, standing alone, is sufficient evidence.








Furthermore, the circumstantial evidence presented showed
the following: (1)  appellant knew the first drug deal between Strawder and
Gutierrez went bad; (2) Strawder and appellant were working together in the
second drug deal; (3) investigators found blood in the front passenger-side
door jam of Garretson=s car; (4) Strawder told the police he
cleaned the car with Clorox before the police found it; (5) appellant knew
Strawder cleaned the car; and (6) appellant=s cell-phone
records indicated his cell phone was in the vicinity of the entertainment
complex at the time of the murder.  Additionally, appellant failed to provide
any contrary evidence.

Viewing the evidence in the light most favorable to the
verdict, we hold the evidence is legally sufficient to support appellant=s conviction for
murder because any rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt.  See Salinas, 163 S.W.3d at 737.  Viewing the
evidence in a neutral light, we hold the evidence supporting the verdict is neither
so weak the verdict is clearly wrong and manifestly unjust, nor is the contrary
evidence so strong the beyond-a-reasonable-doubt standard could not have been
met.  See Prible, 175 S.W.3d at 730B31.  Thus, the
evidence is factually sufficient to support appellant=s conviction.  We
overrule appellant=s first two issues.

conclusion

Having overruled all three of
appellant=s issues, we affirm the trial court=s judgment.

 

 

 

 

/s/      John S. Anderson

Justice

 

 

 

Judgment rendered
and Memorandum Opinion filed May 29, 2008.

Panel consists of
Justices Yates, Anderson, and Brown.

Do Not Publish C Tex. R. App. P. 47.2(b).