Affirmed and Memorandum Opinion filed August 26, 2008








Affirmed and Memorandum Opinion filed August 26, 2008.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00479-CR 

NO. 14-07-00480-CR 

NO. 14-07-00481-CR

____________

 

CARLOS VELA TREVINO, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 185th
District Court

Harris County, Texas

Trial Court Cause Nos. 1066188,
1066187, 1066186

 



 

M E M O R A N D U M   O P I N I O N








A jury convicted appellant, Carlos Vela Trevino, of three
counts of attempted capital murder and sentenced him to life imprisonment in
the Texas Department of Criminal Justice, Institutional Division on each
count.  See Tex. Penal Code Ann. '' 15.01(a),
19.02(b)(1) (Vernon 2003), 19.03(a)(1) (Vernon Supp. 2007).  Appellant=s sentences are to
run concurrently.  In six points of error, appellant argues the evidence is
legally and factually insufficient to support each conviction because the State
failed to prove the requisite mens rea for attempted capital murder.[1] 
We affirm. 

Factual and Procedural Background

On April 22, 2006, Loyce Hunter, appellant=s neighbor, heard
someone fire a gunshot from appellant=s house.  Loyce
was concerned for the safety of appellant=s wife and
children because appellant had fired his gun in the past, so Loyce called the
police department.  A police officer arrived approximately five minutes after
Loyce=s call.  Loyce=s husband, Gerald
Hunter, left earlier that morning to get breakfast, and as he arrived home, he
saw the police car and noticed an officer attempting to make contact with
someone in appellant=s house.  Shortly thereafter, appellant=s wife and
children exited the house, but appellant did not.  Several other officers
arrived on the scene to assist, and on multiple occasions, Officer Edwin
LaCourt attempted to contact appellant through a loudspeaker.  Officer LaCourt
spoke to appellant in Spanish.  In addition, Officer LaCourt allowed appellant=s wife and brother
to use the loudspeaker in an attempt to convince appellant to come out of the
house.  Despite these attempts, appellant refused to exit the house.  Appellant=s brother also
asked Officer LaCourt if he could enter the house and speak with appellant;
however, for safety reasons, Officer LaCourt would not allow appellant=s brother to
enter.








Approximately one hour later, three officers from the
Houston Police Department Canine Unit decided to sweep and clear appellant=s house.  Prior to
entering the house, the officers made announcements in both English and Spanish
requesting appellant to identify himself and surrender.  Officer Robert Mason
and his canine, Baro, led the team.  Officer Andrew Porras went in second and
was in charge of handling the assault rifle.  Officer Landrum Gay went in last,
carrying a sidearm weapon and a canine snare, in case any loose animals were in
the house.  Before entering each room, the officers again made announcements
asking appellant to surrender.

As the officers approached the last bedroom, they noticed
the bedroom door was closed but the bedroom light was illuminated.  The
officers made a final announcement in both English and Spanish, and then
Officer Gay kicked the bedroom door open.  Officer Gay performed an initial
sweep of the bedroom and then retreated into the hallway to stand as backup
with Officer Porras.  Next, Officer Mason and Baro entered the room. 
Immediately upon entering the room, Baro indicated the presence of a strong
human odor.  Officer Mason first cleared the closet, and then heard Officer
Porras shout that a shoe was sticking out from under the bed.  Officer Mason
approached the bed and attempted to pick up the mattress and box spring. 
However, as Officer Mason lifted up the bed, appellant discharged his gun. 
Officer Mason immediately dropped the bed, retrieved his gun, discharged his
gun several times, and then retreated.

After Officer Mason retreated, Officer Porras stepped into
the bedroom and began firing his weapon.  During the exchange of gunfire
between Officer Porras and appellant, a bullet struck Officer Porras in the
knee.  Officer Porras dropped to his knee, indicated to the other officers he
had been hit, and continued to fire in the direction of the bed.  At that
point, Officer Gay stepped into the bedroom to engage the shooter so Officer
Porras could retreat.  Officer Gay noticed someone attempting to rise up from
under the bed, so he discharged his weapon in the direction of the bed allowing
Officer Porras a chance to retreat.  According to Officer Gay, he emptied his
first round of ammunition and reloaded his weapon; as he stepped back into the
room, appellant shot at him again.  Eventually, Officer Gay retreated and
helped Officer Porras exit the house. 








Shortly after the three officers exited appellant=s house, Officer
Mason heard a loud crash off to the side and noticed appellant jumping out of the
window.  Officer Mason immediately released Baro and instructed him to attack
appellant.  Baro caught appellant; however, appellant continued to struggle and
fight with Baro.  Officer Mason and several other officers ran to assist Baro. 
The officers were concerned appellant might still have a weapon, so they
instructed appellant to show his hands.  Appellant refused to comply with the
officers= commands, so
Officer Gay used his taser on appellant.  Appellant eventually showed his
hands, and Officer LaCourt placed appellant in handcuffs.  An officer then
performed a quick pat down of appellant and did not find a weapon.  Still
concerned appellant might have a weapon, Officer Jim Adkins of the Houston
Police Department pulled out his knife and cut appellant=s clothes off of
him.  Officer Adkins did not find a weapon on appellant.  The Houston Fire
Department subsequently treated appellant for multiple injuries, including
gunshot wounds, sustained during the encounter.  Appellant was then taken into
custody for the attempted capital murder of Officers Gay, Porras, and Mason.

The following day, Officer H.A. Chavez, a Houston Police
Department investigator, interviewed appellant at Ben Taub Hospital, where
appellant was being held in custody while recovering from his injuries. 
Officer Chavez taped appellant=s interview and spoke to appellant in
Spanish, which was later translated into a written transcript in English. 
During the interview, appellant claimed his wife approached him around 9:00
that morning and informed him she was leaving.  According to appellant, he
asked her not to leave, but he never threatened her or shot at her.  However,
according to appellant, during their discussion, his wife called the police. 
Appellant explained he had a .38 caliber revolver in his car, and when the
police arrived at his house, he grabbed the gun and ran inside his house in
order to hide the gun.  Appellant then hid between the mattress and the box
spring of his daughter=s bed for approximately one hour.








According to appellant, he did not hear the police, his
wife, or his brother try to communicate with him over the loudspeaker; however,
appellant admitted he did hear the police make an announcement before entering
the house and before entering the bedroom.  Appellant knew the police were
sweeping the house, but he did not have a reason why he refused to identify
himself or surrender.  Officer Chavez next asked appellant what happened when
the officers went into the bedroom, and appellant responded, AI fired the pistol
outward.@  According to
appellant, he fired his pistol Auntil it didn=t pop any more.@  However,
appellant later explained to Officer Chavez he did not fire toward the
officers, but instead fired the pistol upward.  In addition, appellant claimed
he was unaware a bullet hit Officer Porras.

Appellant went on to explain that after the officers left
his house, he got out from under the bed and jumped out of a window.  According
to appellant, after jumping out of the window, an officer=s dog knocked him
to the ground.  Appellant claimed he did not resist the dog or the officers,
but the officers still kicked him, hit him, and pulled on him.  Finally,
Officer Chavez asked appellant what his intentions were that day, and appellant
responded, AI wanted them to kill me . . . [b]ut I didn=t shoot over them,
I just shot upward.@  The State introduced both the tape and
the written transcript into evidence during the trial. 








During trial, Gerald, appellant=s neighbor, testified
appellant=s wife worked as his house cleaner and had recently
discussed her plans to leave appellant.  Gerald also testified appellant owned
a .38 caliber revolver with a rubber band wrapped around the trigger spring. 
According to Gerald, appellant previously had shown him the gun.  Gerald
testified after the three officers went into appellant=s house, he heard
two shots from what sounded like a pistol, and then he heard an array of
gunfire.  Gerald testified he was familiar with guns, and in his opinion, the
sound from the first two shots fired was consistent with a .38 caliber
revolver.  Gerald also testified when appellant=s wife heard the
gunfire, she immediately began running toward the house, but the police stopped
her.  On cross-examination, Gerald testified he thought two of the officers
were carrying long rifles, but he admitted he did not know whether they were
also carrying pistols.  Loyce, Gerald=s wife, testified
she heard a gunshot from appellant=s house that
morning and called the police.  However, on cross-examination, Loyce admitted
she never saw appellant fire his weapon.

Sergeant Glen West of the Houston Police Department
testified he arrived on the scene around 11:40 a.m.  Sergeant West testified he
videotaped the scene in order to document the evidence and his partner, Officer
Mike Perez, photographed the scene.  According to Sergeant West, he found
extensive firearm evidence at the scene, and he recovered a .38 caliber
revolver with a rubber band wrapped around the trigger guard underneath the
mattress in the bedroom where the encounter occurred.  Sergeant West testified
all five bullets in the revolver had been fired; however, he also testified no
latent prints were found on the weapon.  Sergeant West testified he found
damage to the inside of the bedroom door and to the door frame of the closet
door.  Sergeant West also testified he found a fired bullet lodged in the door
frame of the closet.  In addition, Sergeant West testified he found dark
markings on both the box spring and mattress, which appeared to be residue from
a fired weapon.  According to Sergeant West, the room in which the incident
occurred was a ten-foot-six-inch by ten-foot-six-inch room.

Officer LaCourt testified he arrived on the scene around
9:14 a.m.  According to Officer LaCourt, he made multiple attempts to contact
appellant.  Officer LaCourt testified after the three officers entered
appellant=s home, he heard gunfire and shortly thereafter, he
heard over the radio an officer had been shot.  In addition, Officer LaCourt
testified that after appellant jumped out of the window and Baro attacked him,
Officer LaCourt may have put his foot on appellant to restrain him, but he did
not recall kicking appellant.  Furthermore, Officer LaCourt testified he never
witnessed any other officer beat appellant.  On cross-examination, Officer
LaCourt admitted he never witnessed appellant discharge a weapon and never
heard appellant make any threats.








Sergeant Patrick LeBlanc, an investigator with the Houston
Police Department Crime Scene Unit, testified he performed a scanning electron
microscope test kit on one of Officer Mason=s boots that he
was wearing at the time of the incident.  Sergeant LeBlanc explained the test
kit was used to look for gunpowder residue.  William Davis, a trace evidence
manager with the Harris County Medical Examiner=s Office, testified
he performed the test on the kit collected by Sergeant LeBlanc and found the
sampled surface was positive for gunshot residue.  Davis testified the results
were consistent with the officer=s shoe being in
the middle of a closed-room gunfight; however, on cross-examination, Davis
admitted he could not determine whether the residue came from a particular gun.


Officers Gay, Porras, and Mason all testified to the events
that occurred in the house, as described above.  In addition, Officer Gay
testified, in his opinion, appellant tried to shoot them in the bedroom.  He
also testified he did not witness anyone kick or abuse appellant.  Officer
Porras testified he received a glancing blow to his knee, and the bullet that hit
his knee came from the direction of the bed.  Officer Mason testified he did
not have gunpowder residue on his boot before entering appellant=s house, and once
he noticed the residue, he sent a sample of the residue from his boot in for
testing.

Jose Quintero, appellant=s landlord,
testified he examined the house approximately two to three weeks after the
shooting and estimated there were approximately thirty bullet holes in the bedroom. 
Quintero also testified he examined the bedroom ceiling; however, he did not
find any bullet holes in the ceiling.

Lastly, Michael Lyons, a forensic scientist and firearms
examiner with the Houston Police Department Firearms Lab, testified he reported
to the scene around 12:50 p.m. and examined the weapons, casings, and fired
bullets.  According to Lyons, at least three of the fired bullets found were
consistent with being fired from appellant=s gun.  In addition,
Lyons testified a .38 caliber revolver should penetrate a mattress.








For the defense, appellant first called his brother,
Cesario Trevino.  Trevino testified he informed the police he could bring
appellant to them if they would allow him inside the house, but the officers
would not let him go inside.  Trevino also testified he witnessed an officer
kick appellant.  On cross-examination, Trevino admitted the police allowed him
to talk to appellant through the loudspeaker; however, Trevino testified the
loudspeaker was not very loud.  Marina Galvan, appellant=s sister, also
testified the police would not allow her to go inside and speak with
appellant.  Furthermore, Galvan testified she could not hear the loudspeaker
very well and she witnessed the police kicking appellant and ripping his
clothes.

Ultimately, a jury convicted appellant of three counts of
attempted capital murder and sentenced him to life imprisonment in the Texas
Department of Criminal Justice, Institutional Division on each count.  This
appeal followed.     

Discussion

Appellant argues the evidence is legally and factually
insufficient to support appellant=s conviction for
attempted capital murder because the State failed to prove appellant
intentionally, with the specific intent to commit the offense of capital
murder, shot at the complainants.  According to appellant, his conduct was
inconsistent with a specific intent to kill.  We disagree with appellant.

1.       Standard
of Review








In a legal sufficiency review, we view all the evidence in
the light most favorable to the verdict and determine whether any rational
trier of fact could have found the essential elements of the crime beyond a reasonable
doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61
L. Ed. 2d. 560 (1979); Salinas
v. State, 163 S.W.3d 734, 737 (Tex. Crim. App. 2005).  The jury, as the
sole judge of the credibility of the witnesses, is free to believe or
disbelieve all or part of a witness=s testimony.  Jones v. State,
984 S.W.2d 254, 257 (Tex. Crim. App. 1998).  The jury may reasonably infer facts
from the evidence presented, credit the witnesses it chooses to, disbelieve any
or all of the evidence or testimony proffered, and weigh the evidence as it
sees fit.  Sharp v. State, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). 
Reconciliation of conflicts in the evidence is within the jury=s discretion, and
such conflicts alone will not call for reversal if there is enough credible
evidence to support a conviction.  Losada v. State, 721 S.W.2d 305, 309
(Tex. Crim. App. 1986).  We
do not engage in a second evaluation of the weight and credibility of the
evidence, but only ensure the jury reached a rational decision.  Muniz v.
State, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993); Harris v. State,
164 S.W.3d 775, 784 (Tex. App.CHouston [14th Dist.] 2005, pet. ref=d).  Inconsistencies in the evidence
are resolved in favor of the verdict.  Curry v. State, 30 S.W.3d 394,
406 (Tex. Crim. App. 2000). 

In a factual
sufficiency review, we consider all the evidence in a neutral light.  Prible
v. State, 175 S.W.3d 724, 730B31 (Tex. Crim. App. 2005).  The
evidence may be factually insufficient in two ways.  Id. at 731.
 First, when considered by itself, evidence supporting the verdict may be
so weak the verdict is clearly wrong and manifestly unjust.  Id.  Second,
where the evidence both supports and contradicts the verdict, the contrary
evidence may be strong enough the beyond a reasonable doubt standard could not
have been met.  Id.  In conducting a factual sufficiency review, we must
employ appropriate deference so we do not substitute our judgment for that of
the fact finder.  Jones v. State, 944 S.W.2d 642, 648 (Tex. Crim. App.
1996).  Our analysis must consider the evidence appellant claims is most
important in allegedly undermining the jury=s verdict.  Sims v. State, 99
S.W.3d 600, 603 (Tex. Crim. App. 2003). 

2.       Analysis








Under the Texas Penal Code, a person commits the offense of
murder if he intentionally or knowingly causes the death of an individual. 
Tex. Penal Code Ann. ' 19.02(b)(1).  A person commits the
offense of capital murder if the person commits murder as defined under section
19.02(b)(1) and the person murders a peace officer or fireman who is acting in
the lawful discharge of an official duty and who the person knows is a peace
officer or fireman.  Id. ' 19.03(a)(1).  A
person commits the offense of criminal attempt if, with specific intent to
commit an offense, he does an act amounting to more than mere preparation that
tends but fails to effect the commission of the offense intended.  Id. ' 15.01(a).  

Appellant=s only argument on appeal is the evidence
is legally and factually insufficient to show he had the specific intent to
cause the death of the three officers; thus, according to appellant, at most,
he can only be guilty of the offense of deadly conduct.  

A person acts intentionally, or with intent, with respect
to the nature of his conduct or to a result of his conduct when it is his conscious
objective or desire to engage in the conduct or cause the result.  Tex. Penal
Code Ann. ' 6.03(a) (Vernon 2003).  Intent is a question of fact
within the sole purview of the jury.  See Brown v. State, 122 S.W.3d
794, 800 (Tex. Crim. App. 2003) (A[T]he defendant=s state of mind is
a question of fact that must be determined by the jury.@).  The jury can
infer intent from other facts in the record.  See Manrique v. State, 994
S.W.2d 640, 649 (Tex. Crim. App. 1999).  Intent can be inferred from the
circumstantial evidence surrounding an incident including the acts, words, and
conduct of the accused. Patrick v. State, 906 S.W.2d 481, 487 (Tex.
Crim. App. 1995).  Additionally, the specific intent to kill may be inferred
from the use of a deadly weapon, unless the manner of its use makes it
reasonably apparent death or serious bodily injury could not have resulted.  Godsey
v. State, 719 S.W.2d 578, 580B81 (Tex. Crim.
App. 1986).  If a person used a deadly weapon in a deadly manner, the inference
is almost conclusive the person intended to kill.  Id. at 581.               








First, and foremost, the facts of this case show appellant
used a deadly weapon in a deadly manner.  Appellant does not deny shooting the
gun; however, he attempts to argue he did not specifically aim at the officers
but rather fired his gun toward the ceiling.  Nevertheless, even if we accept
appellant=s argument, we must still conclude when appellant
fired a gun in a small, enclosed area he used a deadly weapon in a manner that
made it reasonably apparent death or serious bodily injury could have
resulted.  Thus, a specific intent to kill may be inferred.  See Rojas v.
State, 171 S.W.3d 442, 447 (Tex. App.CHouston [14th
Dist.] 2005, pet. ref=d) (holding the evidence legally and
factually sufficient to support the inference that appellant knew his shooting
a gun in the general direction of a group of people, including the
four-year-old victim, was reasonably certain to result in a death).  

Furthermore, we find the evidence presented was legally and
factually sufficient for the jury to believe appellant did specifically aim and
fire a deadly weapon at the officers, thus also allowing an inference of a
specific intent to kill.  See Godsey, 719 S.W.2d at 583 (holding
in the context of capital murder, the defendant established a specific intent
to kill when he slowly and deliberately pulled a loaded gun in direct violation
of police instruction and thereafter moved it in such a way as to aim at the
two officers, making his only remaining act to pull the trigger and hit the
target).  This evidence includes: (1) evidence a bullet struck Officer Porras
in the knee; (2) Officer Porras=s testimony the bullet that hit him came
from the direction of the bed where appellant was hiding; (3) Officer Gay=s testimony
appellant tried to shoot them; (4) appellant=s statement he
knew the police were in the house and that he Afired the pistol
outward@; (5) appellant=s statement he
fired the gun Auntil it didn=t pop any more@; (6) Sergeant
West=s testimony
regarding the damage to the inside of the bedroom door and door frame of the
closet, and his testimony he found a fired bullet lodged in the door frame of
the closet, all indicating bullets were fired in the officers= direction;[2]
(7) evidence of gunpowder residue found on Officer Mason=s boot; and (8)
Quintero=s testimony there
were no bullet holes in the bedroom ceiling.     








The evidence appellant claims allegedly undermines the jury=s verdict includes: (1) no one
testified appellant had the specific intent to kill the police officers; (2) no
one testified appellant specifically aimed in the direction of the police
officers; (3) appellant=s statement to Officer Chavez he was
aiming at the ceiling; (4) appellant=s statement to
Officer Chavez he was unaware Officer Porras was hit; and (5) the fact
appellant did not have a gun when he exited the house.  First, the fact there
was no direct testimony that appellant had the specific intent to kill and no
direct testimony appellant specifically aimed in the officers= direction is not
determinative because intent can be inferred from the circumstantial evidence
surrounding an incident.  Patrick, 906 S.W.2d at 487.  Furthermore,
while some of appellant=s statements to Officer Chavez may
contradict a specific intent to aim directly at the officers, the jury may
reasonably infer facts from the evidence presented, credit the witnesses it
chooses to, disbelieve any or all of the evidence or testimony proffered, and
weigh the evidence as it sees fit.  Sharp, 707 S.W.2d at 614. 
Reconciliation of conflicts in the evidence is within the jury=s discretion, and
such conflicts alone will not call for reversal if there is enough credible
evidence to support a conviction.  Losada, 721 S.W.2d at 309.  

After viewing the evidence in the light most favorable to
the verdict, we hold any rational trier of fact could have found the essential
elements of attempted capital murder, including a specific intent to kill,
beyond a reasonable doubt.  See Salinas, 163 S.W.3d at 737.  Therefore, the evidence is legally sufficient to
support appellant=s convictions.  In addition, viewing the evidence in a
neutral light, we hold the evidence supporting the verdict is not so weak
so as to conclude the verdict is clearly wrong and manifestly unjust; nor was
the contrary evidence so strong the beyond a reasonable doubt standard could
not have been met.  See Prible, 175 S.W.3d at 730B31.  Thus, the
evidence is factually sufficient to support appellant=s convictions. 
Accordingly, we overrule appellant=s six issues on
appeal. 

 

 

 

 

 








Conclusion

Having overruled all of appellant=s issues, we
affirm the trial court=s judgment.

 

 

 

/s/      John S. Anderson

Justice

 

 

 

 

Judgment rendered
and Memorandum Opinion filed August 26, 2008.

Panel consists of
Justices Yates, Anderson and Brown.

Do Not Publish C Tex. R. App. P.
47.2(b).









[1]  Appellant=s
points of error one, two, and three address whether the evidence was legally
sufficient for each conviction.  Appellant=s
points of error four, five, and six address whether the evidence was factually
sufficient for each conviction.  Thus, we will consolidate appellant=s six issues into two points of error. 





[2]  The State introduced into evidence photographs of the
bedroom, which showed that the closet was located next to the bedroom door.