



# MEMORANDUM OPINION

No. 04-09-00077-CR

Patricia Ann **NOLDEN**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 144th Judicial District Court, Bexar County, Texas
Trial Court No. 2007CR5993
Honorable Pat Priest, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:    Catherine Stone, Chief Justice
Karen Angelini, Justice
Marialyn Barnard, Justice

Delivered and Filed:   November 4, 2009

AFFIRMED

Patricia Ann Nolden was found guilty of aggravated robbery and was sentenced to twenty-eight years of imprisonment.  On appeal, she argues that the evidence is factually insufficient to sustain her conviction.  We affirm.

**BACKGROUND**

At trial, Ray Rogers, a security guard at a local bank in San Antonio, Texas, testified that on April 10, 2007, at approximately 3:00 p.m., he was standing outside the bank, smoking a cigarette, when an African-American woman approached him and asked him if he could help her with her vehicle. Rogers explained that it was against bank policy for him to help her, but told her that there was a courtesy phone inside the bank. Rogers testified that the woman patted her right front pocket and said that she had a cell phone. According to Rogers, he then watched the woman walk away.

After Rogers finished smoking his cigarette, he went back inside the bank. However, as he was standing in the foyer of the bank, a stream of sunlight reflecting off the windshields of cars parked outside the bank kept bothering his eyes. So, Rogers decided to go back outside and get his sunglasses from his truck. Rogers testified that as he opened the driver's side door of his truck and reached inside for his sunglasses, he heard a sliding door of a van open. Rogers grabbed his sunglasses and turned around to see a man pointing a rifle in his face. The man said, "Give it to me." Rogers did not know whether the man was referring to Rogers's gun, wallet, or keys. Rogers asked the man what he wanted and then grabbled the barrel of the rifle, moving the barrel away from his face. As Rogers and the man struggled over the rifle, the man tried to get Rogers's gun, but was unable to do so. Rogers then heard the man yell, "Pat. Pat. Come here. Pat. Pat." According to Rogers, the same woman who had approached him earlier came in response to the man's call. The woman reached in, unsnapped Rogers's holster, and pulled Rogers's gun out. The woman then pointed the gun at Rogers.

Rogers testified that he then saw a witness approach. The woman turned and pointed Rogers's gun at the approaching man. Rogers told the man to back away because the gun was

loaded. The male and female assailants then started backing away while pointing the guns at Rogers and the witness. The male assailant got inside a maroon Dodge Caravan through an open sliding side door, and the female assailant went around to the front of the van and got into the driver's seat. As the van was pulling away, Rogers tried to get the license plate number of the van, but it did not have a license plate on either the front or the back of the vehicle.

The witness, Harry Couch, testified at trial that he was leaving the bank when he saw the bank's security guard struggling with someone. His first impression was that the security guard was trying to stop someone who was drunk from getting inside a vehicle. Both men's heads were "kind of bobbing." According to Crouch, the men were not more than six inches apart. Crouch, who was about sixty feet away from the men, could tell something was wrong, so he started walking toward them. When he was about halfway to the men, he saw a barrel of a rifle pointing up between them. Crouch then saw an African-American woman get out of the driver's side of a dark, maroon van, parked close to where the men were struggling. At first, Crouch did not pay much attention to the woman, but as he walked toward the men, the woman stepped out and came around to the front of the van. Crouch then saw the woman motion to him, gesturing to him that "it's okay, it's okay." Crouch then saw the woman move between the struggling men and reach in. At that point, Crouch realized that the woman was trying to get the security guard's gun. Crouch saw the woman get the security guard's pistol. The woman then began moving away, touching Crouch as she backed away. According to Crouch, as she backed away, the woman pointed the gun at him and said, "You back off." Crouch testified that he was less than five feet away from the woman at this point. Crouch then saw the male assailant get inside the side door of the van, and the female assailant get inside the van through the driver's side door.

Detective Jeff Smith arrived on the scene to investigate the robbery. According to Detective Smith, he had received information that a man named Christopher Donnan was going to commit a robbery that day. Thus, after Rogers described the assailant to Detective Smith, Detective Smith thought that Rogers's description matched Christopher Donnan. So, Detective Smith returned to the station and created a photo lineup, which included a picture of Donnan. Detective Smith then took the photo array to Rogers and asked Rogers if he saw anyone familiar. Rogers identified a photo of Donnan, stating that the man in the photo looked like the male assailant.

That same night, Detective Tony Arcuri, who worked in the Repeat Offenders Unit, had received information that Donnan was at a home located at 506 Bluebonnet Street. After getting a warrant, Detective Arcuri and other officers, all in plain clothes and unmarked cars, maintained surveillance on the home as they waited for S.W.A.T. According to Detective Arcuri, patrol officers were out of sight, about a street or two away from the home. Detective Arcuri then saw a man on a bicycle leave the home. Detective Arcuri followed the man for three blocks. Patrol officers then stopped the man on the bicycle and asked who was inside the home. The man told the officers that Donnan was inside the home. A man matching Donnan's description then came out of the home. As the man began walking down a sidewalk, the officers decided not to wait for S.W.A.T. and to "take [Donnan] down at the next corner." According to Detective Arcuri, Officer Garza, in full uniform, pulled up to Donnan in a patrol car and got out of the car. After Officer Garza said something to Donnan, Donnan ran away and was tackled by Officer Garza. Detective Arcuri testified that when he saw Donnan pull a gun out of his waistband, he fired his weapon and shot Donnan. According to Detective Arcuri, Officer Garza also shot his weapon twice, likewise hitting

Donnan. Donnan later died as a result of gunshot wounds. It was later determined that the gun Donnan had pulled out of his waistband was the same gun that had been stolen from Rogers earlier.

The search warrant was then executed on the home located at 506 Bluebonnet Street. Nolden, along with two other people, was present in the home. A maroon van was in the backyard of the home, and inside the van was a blue sweatshirt that matched the description of what the male suspect had been wearing at the time of the robbery. A stolen rifle matching the description of the rifle used in the robbery was found in the back storage room.

Two days later, Rogers was presented with a photo array containing pictures of women. Rogers told the officer that although he was not positive, the woman in the fourth photograph looked like the woman who had taken his gun. Later that day, the other witness, Couch, was also shown the same photo array. Unlike Rogers, Couch was confident in his identification, and without hesitation identified the woman in the fourth photograph as the female assailant. The woman depicted in the fourth photograph was the defendant, Patricia Nolden. At trial, both Rogers and Couch identified Nolden as the female assailant.

Nolden testified in her own defense at trial. According to Nolden, she lived in the home located at 506 Bluebonnet Street with her boyfriend. She knew Donnan because he sold meat to her that he had bought with food stamps, and her boyfriend was friends with Donnan. Nolden claimed that she had back and knee injuries due to a work-related accident and that she had been at her doctor's office at the time of the robbery. Nolden testified that because of her injuries, she cannot drive and could not have driven a car on the day of the robbery. Nolden also testified that she had been imprisoned twice. In 1992, she was convicted of a felony theft offense, and in 1994, she was convicted of a felony forgery offense.

On cross-examination, Nolden admitted that she had been convicted of six different charges, not just two. Nolden also admitted that although she had just testified on direct examination that her boyfriend and Donnan were friends, when she spoke to police at the time of the robbery, she told police that she had known Donnan for only a week. Nolden claimed that her testimony was not inconsistent with her statement to police because it was her boyfriend who had been "dealing" with Donnan and that she had only known Donnan "personally, with him dealing with me, for about a week." Nolden also admitted that she had told police that Donnan had a large quantity of crack cocaine, but denied having told police that Donnan "came in and we all sat around and smoked crack cocaine together." Nolden testified that the maroon van belonged to Donnan and that he had driven it to her house on the day of the robbery. According to Nolden, Donnan had parked the van in the driveway, but she had asked Donnan to move it to the backyard. Nolden claimed that the van was not working and that she did not want it to block the driveway. Nolden also denied having any knowledge about the rifle found in the back storage room. And, when asked how she had gotten to her doctor's office on the day of the robbery since she could not drive, Nolden claimed that someone from the doctor's office would pick her up three times a week. She could not, however, remember the name of the driver.

## FACTUAL SUFFICIENCY

On appeal, Nolden argues that the evidence is factually insufficient to support her conviction, emphasizing that identification was the main issue in this case, that eyewitness testimony is inherently unreliable, and that Nolden became a suspect only because she lived at the house on Bluebonnet Street. In a factual sufficiency review, we view all the evidence in a neutral light and will set the verdict aside only if the evidence is so weak that the verdict is clearly wrong and

manifestly unjust, or the contrary evidence is so strong that the standard of proof beyond a reasonable doubt could not have been met. *Prible v. State*, 175 S.W.3d 724, 730-31 (Tex. Crim. App. 2005).

The evidence presented at trial is clearly factually sufficient to support Nolden's conviction of aggravated robbery. Although Rogers was not completely positive in his identification of Nolden from the photo array, Couch was confident in his identification of Nolden. At trial, both identified Nolden as the woman who had committed the aggravated robbery. Further, Rogers testified that as he was struggling with the male assailant, the man called out for "Pat" to come help. The defendant's name is Patricia. Additionally, Nolden and Donnan were together at the home on Bluebonnet on the day of the robbery, and Donnan later pulled out the same pistol that had been taken from Rogers during the robbery. A maroon van that matched the description of the vehicle used in the robbery was parked in Nolden's backyard. And, finally, a rifle matching the description of the one used in the robbery was found in the back storage room.

We, therefore, hold that the evidence is factually sufficient.

Karen Angelini, Justice

DO NOT PUBLISH