

*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*

★ ★ ★        ★ ★ ★

# MEMORANDUM OPINION

No. 04-09-00008-CV

## IN THE MATTER OF Z.J.R.

From the 289th Judicial District Court, Bexar County, Texas
Trial Court No. 2008-JUV-02577
Honorable Carmen Kelsey, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:        Karen Angelini, Justice
               Steven C. Hilbig, Justice
               Marialyn Barnard, Justice

Delivered and Filed: March 3, 2010

AFFIRMED

This is an appeal from the trial court's orders of disposition and adjudication following a jury trial for deadly conduct in a juvenile case. On appeal, Appellant Z.J.R. argues that the evidence is factually insufficient to support the finding that he committed the offense of deadly conduct. We affirm.

## BACKGROUND

Z.J.R., who was thirteen years old at the time of the incident, was charged by petition with having engaged in delinquent conduct by committing the offense of deadly conduct pursuant to Subsections 22.05(b)(1) and (2) of the Texas Penal Code. Z.J.R. pled not true to the charge. The jury,

however, found that Z.J.R. had engaged in delinquent conduct, and following a disposition hearing, committed Z.J.R. to the Texas Youth Commission for a determinate sentence of ten years, with a possible transfer to the Texas Department of Criminal Justice. Z.J.R. then filed a motion for new trial, arguing that the evidence was both legally and factually insufficient to support the jury's finding. The trial court denied the motion. Z.J.R. now appeals.

### FACTUAL SUFFICIENCY

In reviewing a challenge to the sufficiency of the evidence in juvenile adjudications, we use the standards of review applicable in criminal cases. *In re J.W.*, 198 S.W.3d 327, 330 (Tex. App.—Dallas 2006, no pet.); *In re A.C.*, 949 S.W.2d 388, 390 n.1 (Tex. App.—San Antonio 1997, no writ). In a factual sufficiency review in a criminal case, we view all the evidence in a neutral light and will set the verdict aside only if the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the contrary evidence is so strong that the standard of proof beyond a reasonable doubt could not have been met. *Prible v. State*, 175 S.W.3d 724, 730-31 (Tex. Crim. App. 2005). Further, the jury is the exclusive judge of the witnesses' credibility and the weight to give their testimony. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996).

On appeal, Z.J.R. argues that the evidence is factually insufficient to support the jury's finding on the issue of identity. We disagree.

At trial, twenty-five-year-old Jimmy Arroyo testified that on July 12, 2008, at approximately 9:30 p.m., he was outside his mother's home, sitting on a concrete ditch with his brother, Mark Arroyo, and his friend, Alberto Hoffman. According to Jimmy, a teenage boy whom Jimmy later identified as Z.J.R. was walking up and down the street with a friend, I.O., in front of Jimmy's mother's home. Jimmy testified that he knew Z.J.R. and I.O. only by their nicknames. Jimmy heard

Z.J.R. call Mark a "pussy." According to Jimmy, the next time Z.J.R. walked by, Z.J.R. stated that he had his "nine" on him with a "fully loaded clip."

Jimmy testified that around midnight, he decided to leave his mother's home and was backing his GMC Yukon out of the driveway when a Chevy Cobalt, driven by Z.J.R.'s brother, stopped in the middle of the street. Jimmy could see Z.J.R. sitting in the passenger seat of the Cobalt. Jimmy's brother, Mark, was standing on the sidewalk, and his friend, Alberto, was standing in the driveway. According to Jimmy, he said to Z.J.R.'s older brother, "There's three of y'all; there's three of us, and if y'all want to fight, we can fight." Jimmy then saw Z.J.R. pull out a small handgun and point it at Mark. Jimmy turned on his bright headlights, and Z.J.R. pointed the gun in the air and fired. Jimmy testified that Z.J.R.'s brother then reversed the Cobalt a distance, stopped, revved the engine, and then raced the Cobalt toward the Yukon. At the last minute, the Cobalt swerved and clipped the front of the Yukon's bumper.

According to Jimmy, Alberto then ran to the home of Jimmy's in-laws, who lived behind his mother's home on the next street, to tell them to keep the children inside. Mark then got into the Yukon, and Jimmy circled to the next block where his in-laws lived. Alberto then got inside the Yukon, and Mark called 911. Jimmy testified that he drove around the neighborhood looking for the Cobalt in an attempt to retrieve the license plate number. As Jimmy was driving around the neighborhood, he heard three shots, one of which struck and shattered the back window of the Yukon. Jimmy turned quickly on another street in an attempt to head back toward his mother's home. As he approached an intersection, he saw the Cobalt headed toward him and heard more shots fire. He tried to turn left, but the Cobalt cut him off, causing the two vehicles to collide. Jimmy heard someone yell, "Shoot them!" He then saw Z.J.R. "kind of sitting on the door on his side, hanging

over the car, point the gun and start[] shooting." Jimmy testified that he and his brother ducked, and he backed up the Yukon in an attempt to escape. He then heard five to seven shots, one of which hit the front windshield on the driver's side and one of which hit the driver's side door while he was backing up the Yukon. He then drove to a fast food restaurant where he, Mark, and Alberto waited for police to arrive.

Mark testified to the same sequence of events as his brother, Jimmy. He saw Z.J.R. shoot the gun into the air during their first encounter with the Cobalt. Mark then got into the Yukon and called 911. He was told by the dispatcher that the police needed the license plate number. Mark testified that as they were traveling down a street in the neighborhood, he heard about three shots, and then heard the fourth shot hit and shatter the back window of the Yukon. According to Mark, Jimmy then turned left on a street that forms a circle. At the next intersection, Mark saw the Cobalt again, heard two shots, and ducked. The Yukon then collided with the Cobalt. Mark testified that he then looked up and saw Z.J.R. "hanging out the window and start shooting." Thus, both Mark and Jimmy testified that Z.J.R. was the one who shot at them.

Similarly, Alberto testified that he saw Z.J.R. shoot at them. According to Alberto, during their first encounter with the Cobalt, he saw Z.J.R. in the passenger seat, heard him say, "I am going to shoot you," and then saw him point the gun at Mark. Alberto testified that when Jimmy flashed his headlights, Z.J.R. "snapped out of it and pointed the gun [in] the air and took one shot." When Alberto heard a shot go off, he ducked down behind some branches. Later, after warning Jimmy's family to get all the children inside, Alberto got into the Yukon with Jimmy and Mark so that they could get the license plate number of the Cobalt. Alberto testified that the Cobalt then "pulled up" behind the Yukon and three shots were fired. The third shot "blew out the rear window." According

to Alberto, Jimmy then accelerated, trying to get away and back to his mother's home. However, before they could get back to Jimmy's mother's home, they collided with the Cobalt. Alberto testified that he could clearly see Z.J.R.:

> [Z.J.R.] just had his whole body out and was pointing forward like that. He was getting a clear view of us to see [whom] he could shoot, and I could see him through the front window where he was at [sic], and he was pointing down and shooting at the vehicle.

Thus, Alberto, Jimmy, and Mark all testified that they clearly saw Z.J.R. fire the shots.

Z.J.R. testified in his own defense. According to Z.J.R., on the night of July 12, 2008, he went to his cousin's birthday party in Seguin where he met a man named "Eddie," who showed him a gun outside in a rural area. Z.J.R. testified that he had never fired a gun before, and that Eddie let him handle the gun and fire it into a bale of hay in the backyard of his cousin's home. He left the party with his brother, his brother's girlfriend Heather, his friend I.O., and Eddie. Z.J.R. testified that they dropped Heather home first, and as they were returning to their subdivision, their car, a Chevy Cobalt, collided with a Yukon. Z.J.R. was sitting in the passenger seat and his brother was driving. Z.J.R. testified that after the cars collided, he heard gunshots, but did not know who fired them. According to Z.J.R., after hearing gunshots, he quickly got out of the car and ran away.

When asked who "Eddie" was, Z.J.R. testified that he had never met Eddie before that night, and that his brother, Heather, and I.O. did not know Eddie either. According to Z.J.R., Eddie was in the car because he had offered Z.J.R.'s brother $30 for a ride to San Antonio.

Z.J.R. argues that the evidence is factually insufficient because of testimony from the "one neutral witness," Crystina Vachon, a forensic scientist. Vachon testified that she found three microscopic particles containing lead, barium, and antimony on Z.J.R.'s right hand, and four

particles on his left hand. According to Vachon, "[b]ased on morphology and elemental composition of the particles," Z.J.R. "may have discharged a firearm, handled a discharged firearm, or was in close proximity to a discharged firearm." In support of his sufficiency argument, Z.J.R. emphasizes Vachon's testimony that "a firearm will create more residue the more times it's fired." According to Z.J.R., this testimony is consistent with him firing a few gunshots at the party in Seguin and is not consistent with him firing a gun multiple times, as claimed by the State's witnesses.

In making this argument, however, Z.J.R. ignores much of Vachon's testimony. While Vachon did testify that a firearm will create more residue when fired multiple times, she explained she cannot determine how many times a gun was fired based on the number of particles found on a person's hands. According to Vachon, while she would anticipate more particles to be created, "[t]hat does not translate into more being found on the hands."

In addition to Vachon's testimony, Z.J.R. argues that Jimmy, Mark, and Alberto were not consistent in their testimony regarding the number of shots fired. Z.J.R. also points to the recordings of the calls made to 911, arguing that if Mark and Jimmy were being truthful, Mark would have identified Z.J.R. on the calls, as both he and Jimmy knew Z.J.R. by his nickname and knew where his friend I.O. lived. Z.J.R. also argues that unlike what Mark testified to, the 911 dispatchers never asked for a license plate number. Z.J.R. claims that the reason for these inconsistencies is "obvious." According to Z.J.R., "[t]he shots were not fired by Z.J.R., but by Eddie." Z.J.R. argues that such a "theory is consistent with the great weight and preponderance of the evidence, while the theory that Z.J.R. fired the shots is not."

Such credibility questions, however, are the province of the jury. Jimmy, Mark, and Alberto all testified that they saw Z.J.R. fire the gun. Z.J.R. testified that he was not the person who fired

those shots. When contradictory testimonial evidence turns on an evaluation of credibility and demeanor of the witnesses, we must defer to the jury. *See Johnson v. State*, 23 S.W.3d 1, 8 (Tex. Crim. App. 2000). We, therefore, hold that the evidence is factually sufficient and affirm the trial court's judgment.


Karen Angelini, Justice